Michael V. KELLY, II, M.D. and Michael V. Kelly, II, M.D., P.A. d/b/a Aesthetic Surgery Center of Houston; Amit Annamaneni, M.D. and Respiratory Center of North Houston, P.A.; Luis Enrique Castillo, M.D. and North Houston Infectious Disease Associates Correctly Named North Houston Infectious Disease Associates, P.A.; and Houston Northwest Partners Ltd. d/b/a Houston Northwest Medical Center; Appellants

v.

Isidro RENDON, Individually and as Representative of the Estate of Yolanda Leal Rendon; Julian Rendon; and Lauren Rendon; Appellees.

No. 14-07-00622-CV.

Court of Appeals of Texas, Houston (14th Dist.).

March 27, 2008.

---

Curry L. Cooksey, Spring, Alicia T. Kramer, Angela N. Clarke, Houston, D. Allan Jones, The Woodlands, Gary Sommer, James R. Boston, Marion Woodrow Kruse, Jr., Richard M. Law, Houston, for appellants.

John M. O'Quinn, Stacy Lee Little, Neil C. McCabe, Houston, for appellees.

Panel consists of Chief Justice HEDGES and Justices ANDERSON, and BOYCE.

## OPINION

JOHN S. ANDERSON, Justice.

Appellees, Isidro Rendon, individually and as representative of the estate of Yolanda Rendon, Julian Rendon, and Lauren Rendon, filed suit against appellants, Michael V. Kelly, II, M.D. and Michael V. Kelly, II, M.D., P.A. d/b/a Aesthetic Surgery Center of Houston (collectively "Dr.

Kelly"); Amit Annamaneni, M.D. and Respiratory Center of North Houston, P.A. (collectively "Dr. Annamaneni"); Luis Enrique Castillo, M.D. and North Houston Infectious Disease Associates, correctly named North Houston Infectious Disease Associates, P.A. (collectively "Dr. Castillo"); and Houston Northwest Partners Ltd. d/b/a Houston Northwest Medical Center ("Houston Northwest"), for medical malpractice. Appellants each filed objections to appellees' expert witness reports and moved to dismiss appellees' suit pursuant to section 74.351 of the Texas Civil Practice and Remedies Code. The trial court denied appellants' motions. Appellants then filed this interlocutory appeal contending the trial court abused its discretion when it denied their motions to dismiss. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On September 20, 2004, forty-three year old Yolanda Rendon consulted Dr. Kelly complaining of weakness and protrusion of the abdomen. Dr. Kelly examined Ms. Rendon and recommended she have diastasis recti abdominoplasty surgery, a surgical procedure commonly called a tummy tuck. On October 20, 2004, Ms. Rendon had preoperative lab work performed with many bacteria noted in the urine. No further lab work was done and no preoperative antibiotic therapy was ordered. On November 1, Dr. Kelly performed the tummy tuck procedure on Ms. Rendon with no complications reported.

On the evening of November 2, Ms. Rendon experienced a fever of 101.3. The Northwest Houston nurse contacted Dr. Kelly by telephone. Dr. Kelly ordered Tylenol for the fever. Dr. Kelly did not order any lab work or x-ray testing and did not go to the hospital to evaluate Ms. Rendon's condition.

Beginning soon after midnight on November 3, Ms. Rendon's condition began to rapidly worsen. In addition to fever, Ms. Rendon experienced nausea, vomiting, burning abdominal pain, decreased urine output that was dark and concentrated, and weakness. The nurse determined Ms. Rendon was experiencing decreased oxygen saturation and her lungs were congested. Despite Ms. Rendon's deteriorating condition, the nurses made no effort to contact Dr. Kelly. Dr. Kelly finally saw Ms. Rendon at 10:00 a.m. the morning of November 3. Dr. Kelly concluded Ms. Rendon's fever was caused by her getting out of bed. Dr. Kelly ordered no diagnostic tests, discontinued the Tylenol and started her on pain medication and an oral antibiotic.

About noon on November 3, Ms. Rendon's oxygenation level continued to decrease and she complained of dizziness. The nurses started Ms. Rendon on supplemental oxygen therapy that resulted in a small increase in Ms. Rendon's oxygenation level. The duty nurses did not report this development to Dr. Kelly.

During the afternoon of November 3, Ms. Rendon's condition continued to worsen as it was determined her urine output over the past eight hours was only fifty milliliters. When the nurses did contact Dr. Kelly, he ordered additional supplemental oxygen and ordered a chest x-ray, which was performed at 2:00 p.m. This x-ray revealed no acute disease. At 4:30 p.m., the nurses again contacted Dr. Kelly by telephone and he ordered a CBC test and IV fluid hydration. The CBC test noted the white blood count was at a normal level but with bands exhibiting high critical at 40%. Starting at 4:31 p.m. and continuing for the rest of the evening, Ms. Rendon's condition severely deteriorated. Ms. Rendon's blood pressure was critically low and she required continued supple-

mental oxygen therapy to maintain her oxygen saturation levels. At 5:00 p.m., a Foley catheter was inserted and Ms. Rendon produced only a small amount of urine, which was cloudy and had a foul odor. Throughout the afternoon of November 3, Ms. Rendon was kept on the regular post op inpatient unit.

At 6:00 p.m., Dr. Kelly consulted with Dr. Annamaneni, a critical care specialist and pulmonologist. Dr. Annamaneni saw Ms. Rendon an hour later and ordered she be transferred to the intensive care unit ("ICU"). Dr. Annamaneni noted Ms. Rendon had fever, tenderness in the midepigastric and lower rib cage areas, feeble pulse, headache, shortness of breath, and severe hypotension. Dr. Annamaneni also noted Ms. Rendon complained of having burning, crawling pain extending from below the left breast area all the way to the left ankle for the last day or so. Dr. Annamaneni's differential diagnosis included likely sepsis and septic shock, and he noted the source could be the abdomen, urinary tract infection, or the lungs. Ms. Rendon's white blood count was now twenty-three. As part of his transfer of Ms. Rendon to the ICU, Dr. Annamaneni ordered additional tests. Following Dr. Annamaneni's evaluation, Ms. Rendon was transferred to the ICU at 7:45 p.m.

At 7:50 p.m., Dr. Castillo, an infectious disease specialist, assessed Ms. Rendon and noted she looked acutely ill with low blood pressure, elevated heart rate, edema of the abdomen, and erythema. In addition, Dr. Castillo noted Ms. Rendon's abdomen was so tender he could not deeply palpate it. Dr. Castillo noted Ms. Rendon was in shock two days after her abdominoplasty, this shock was probable septic, and the operative site was the most likely source of infection. Dr. Castillo then recommended Ms. Rendon have a CT scan of her abdomen and pelvis. However, he did not order the CT be performed, nor did Dr. Kelly or Dr. Annamaneni.

At 9:30 p.m., Ms. Rendon's condition was so critical, she was started on two pressor medications to keep her systolic blood pressure up. At 10:00 p.m., Ms. Rendon complained of pain of such severity in her abdomen and legs that Dr. Annamaneni ordered she be given morphine every two hours as needed for pain. Ms. Rendon developed generalized edema and a third medication was added at 11:45 p.m. for blood pressure support. Ms. Rendon had been started on two intravenous antibiotics at 7:50 p.m. and at 11:50 p.m., a third antibiotic was added.

As November 3 came to a close, all three doctors treating Ms. Rendon agreed she was in septic shock, but none recommended she be taken back to surgery for exploration and drainage of the surgical wound.

Throughout November 4, Ms. Rendon's condition continued to decline. Ms. Rendon's white blood count was high and continued to increase. She continued to receive morphine for the severe pain she suffered in her abdomen and legs. Ms. Rendon also began to experience additional complications as a result of the severe sepsis: pulmonary edema, kidney failure, and multi-system organ failure. At 5:30 p.m., Dr. Kelly aspirated a small amount of fluid from the lower area of the abdominal wound, which was sent to the lab for testing.

On November 5, Ms. Rendon had severe difficulty breathing, which required she be intubated and placed on a ventilator. At 9:40 a.m., the lab notified the ICU that the body fluid collected by Dr. Kelly the previous evening was positive for Beta Hymolytic Streptococcus Group A bacteria. Dr. Kelly noted the lab results revealed necrotizing fasciitis. Also on November 5, Dr. Castillo called in another surgeon for eval-

uation of Ms. Rendon for a possible return to surgery for debridement of the necrotizing fasciitis. Additional antibiotic therapy was also ordered. While Dr. Castillo agreed Ms. Rendon had to be taken back to surgery for exploration, drainage, and debridement of her abdominal wound, because of her critically low platelet count, her return was delayed while she was given platelets and fresh, frozen plasma.

Ms. Rendon was taken into surgery at 9:05 p.m. in critical condition. While Ms. Rendon was in the operating room, a code was called at 9:27 p.m. and all efforts to resuscitate her were unsuccessful with those efforts ending at 9:45 p.m. Prior to the code, Dr. Kelly opened the surgical wound and discovered a considerable amount of necrotic fatty tissue and suctioned off the necrotic tissue and a large amount of murky fluid from Ms. Rendon's abdomen. Dr. Kelly did not send any of the removed necrotic tissue or the fluid to pathology, but instead, discarded it. The Death Summary, signed by Dr. Kelly noted the diagnoses at death of "diastasis recti" [1] and necrotizing fasciitis. Dr. Kelly also signed Ms. Rendon's Certificate of Death, which noted the immediate cause of death to be septic shock with the underlying cause of necrotizing fasciitis.

On November 7, 2004, Dr. Albert Chen conducted an autopsy. Dr. Chen issued a Preliminary Report on November 7, 2004. Dr. Chen issued his Final Report on January 19, 2005, and a Supplemental Report on September 14, 2006. Dr. Chen concluded Ms. Rendon died as a result of complications from necrotizing fasciitis.

Appellees eventually filed a health care liability lawsuit against appellants. Pursuant to section 74.351 of the Texas Civil Practice and Remedies Code, appellees served on appellants the reports of six

different experts: (1) Dr. Hubert Weinberg, a board certified plastic surgeon; (2) Dr. Richard F. Edlich, a board certified general and plastic surgeon; (3) Dr. Paul Marik, who is board certified in internal medicine and critical care medicine; (4) Dr. C. David Bakken, who is board certified in internal medicine and infectious disease; (5) Lisa Ruth–Sahd, a registered nurse certified in critical care and emergency nursing; and (6) Sharla Shumaker, a registered nurse with experience in critical care nursing. In response, appellants, arguing the reports were deficient, filed objections to each of the expert reports and moved the trial court to dismiss appellees' suit. Following a hearing, the trial court denied appellants' motions. This interlocutory appeal followed.

## DISCUSSION

In this appeal, each set of appellants filed separate briefs raising issues challenging the trial court's denial of their motions to dismiss. As might be expected, there is significant overlap between many of these issues. Therefore, to more efficiently resolve this appeal, and for the sake of clarity, we will consolidate these common issues and address them together. These consolidated issues can be broken down as follows: (1) the qualifications of some or all of appellees' experts to render expert opinions against appellants; (2) the adequacy of the appellees' expert reports as some fail to name a specific defendant; and (3) the adequacy of the appellees' expert reports on the appropriate standard of care and on causation. After addressing these consolidated issues, we will then turn to the remaining issues raised by a single appellant.

## I. Expert Report Requirements

 This is a health care liability lawsuit governed by chapter 74 of the Civil

---

1. This is the original diagnosis leading to the tummy tuck procedure.

Practice & Remedies Code. Tex. Civ. Prac. & Rem.Code Ann. § 74.001 *et seq.* (Vernon 2005). Under these provisions, a claimant is required to produce an expert report within 120 days of the date the claim is filed. *Id.* at § 74.351(a). Under the statute, the expert report must provide a fair summary of the expert's opinions regarding the applicable standards of care, the manner in which the care rendered by the defendant physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed. *Id.* at § 74.351(r)(6). An expert report need not marshal all of the plaintiff's proof, but it must include the expert's opinion on each of the elements identified in the statute. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 878 (Tex.2001) (applying predecessor statute). In setting out the expert's opinions on each of these elements, the plaintiff is not required to present evidence in the report as if it were actually litigating the merits at this preliminary stage of the lawsuit. *Id.* at 879. Indeed, the information in the report can be informal as it does not have to meet the same standards as evidence offered in a summary judgment proceeding or at trial. *Id.* The expert report is not required to prove the defendant's liability. *See Russ v. Titus Hosp. Dist.,* 128 S.W.3d 332, 341 (Tex.App.-Texarkana 2004, pet. denied) (applying predecessor statute). Instead, the report must provide only enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct the plaintiff has called into question and (2) it must provide a basis for the trial court to conclude that the claims have merit. *Palacios,* 46 S.W.3d at 879.

In deciding whether the statutory standard has been met, the trial court examines only the four corners of the expert's report and curriculum vitae. *Mem'l Hermann Healthcare Sys. v. Burrell,* 230 S.W.3d 755, 758 (Tex.App.-Houston [14th Dist.] 2007, no pet.). If the trial court determines the expert report does not represent a good faith effort to comply with the statutory definition, then the trial court, subject to its discretionary authority to grant a thirty day extension to cure the deficiencies in the report, must grant a motion to dismiss challenging the report's adequacy. Tex. Civ. Prac. & Rem.Code Ann. § 74.351(c), (*l*).

## II. The Standard Of Review

We review a trial court's ruling as to the adequacy of an expert report under an abuse of discretion standard. *Estate of Regis ex rel. McWashington v. Harris County Hosp. Dist.,* 208 S.W.3d 64, 67 (Tex.App.-Houston [14th Dist.] 2006, no pet.). The trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Burrell,* 230 S.W.3d at 757. We may not reverse a trial court's discretionary ruling simply because we might have decided it differently. *Id.*

## III. Are Appellees' Experts Qualified To Render Opinions Against Appellants?

### A. Appellees' Physician Experts

Each of the physician appellants contend some or all of appellees' doctors are not qualified to render expert opinions against them. In their challenges to appellees' physician experts, appellants attempt to unduly limit the field of experts qualified to render opinions against them to (1) doctors licensed only in the State of Texas; (2) who practice in the same medical discipline; and (3) in the same type of hospital as each appellant. The statute does not require such specificity when deciding a challenge to an expert's qualifications.

An expert providing opinion testimony regarding whether a physician departed from the accepted standards of health care must satisfy the requirements set forth in section 74.401. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(5)(A). Section 74.401 provides:

> (a) In a suit involving a health care liability claim against a physician for injury to or death of a patient, a person may qualify as an expert witness on the issue of whether the physician departed from accepted standards of medical care only if the person is a physician who:
>
> (1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;
>
> (2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and
>
> (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.
>
> (b) For the purpose of this section, "practicing medicine" or "medical practice" includes, but is not limited to, training residents or students at an accredited school of medicine or osteopathy or serving as a consulting physician to other physicians who provide direct patient care, upon the request of such other physicians.
>
> (c) In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness:
>
> (1) is board certified or has other substantial training or experience in an area of medical practice relevant to the claim; and
>
> (2) is actively practicing medicine in rendering medical care services relevant to the claim.

> * * *
>
> (g) In this subchapter, "physician" means a person who is:
>
> (1) licensed to practice medicine in one or more states in the United States. . . .

*Id.* § 74.401.

**1. Dr. Kelly's Qualification Challenges**

### a. Dr. Edlich

■ Dr. Kelly initially contends Dr. Edlich is not qualified to provide expert opinions because, in Dr. Kelly's view, he is not currently practicing medicine in a field relevant to the claims against Dr. Kelly and also was not doing so when Dr. Kelly treated Ms. Rendon. We disagree. The combination of Dr. Edlich's report and curriculum vitae establish he is still practicing medicine as a physician board certified in both general surgery and plastic surgery, and he has experience treating patients with the same condition as Ms. Rendon. As this health care liability case involves the care of a patient following plastic surgery, we hold Dr. Edlich meets the requirements set forth in section 74.401(a)(1) of the Civil Practice and Remedies Code. *See Sanjar v. Turner,* 252 S.W.3d 460, 465 (Tex.App.-Houston [14th Dist.] 2008, no pet. h.) (citing *In re Stacy K. Boone, P.A.,* 223 S.W.3d 398, 407 (Tex.App.-Amarillo 2006, no pet.) (holding cardiologist was qualified to render expert opinion as to general surgeon's care because opinion was on post-operative therapy and surgeon participated in management of that therapy)).

### b. Doctors Bakken and Marik

■ Next, Dr. Kelly attacks the credentials of both Dr. Bakken, an internal medicine and infectious disease physician, and Dr. Marik, an internal medicine and critical care physician, to render opinions on the standard of care for a plastic surgeon

such as Dr. Kelly. Once again, we disagree.

Here, Dr. Kelly takes the position that both Dr. Bakken and Dr. Marik are not qualified to render opinions against him because their medical specialty is in a different medical discipline from his own. However, the statute does not require a medical expert be practicing in the exact same field as the defendant physician, but instead must only be actively practicing medicine in rendering medical care services relevant to the claim. Tex. Civ. Prac. & Rem.Code Ann. § 74.401(c)(2). Here, the relevant medical services are those for a post-surgical patient showing the signs and symptoms of infection.

In his report, Dr. Bakken states he has thirty-three years of experience specializing in infectious disease. Dr. Bakken also states he has "treated many patients in the past with similar conditions as [Ms.] Rendon. As [an] infectious disease specialist, [he has] been consulted multiple times for patients with diagnoses of postoperative wound infections, sepsis, and necrotizing fasciitis." In his report, Dr. Marik states he has twenty-five years experience in the fields of pulmonary and critical care medicine and is a professor of medicine and chief of the division of pulmonary and critical care medicine at Thomas Jefferson University. Dr. Marik also states he has "treated many patients diagnosed with the same conditions as [Ms.] Rendon, including post-operative infection, sepsis, septic shock syndrome, and necrotizing fasciitis." Because both Dr. Bakken and Dr. Marik have extensive education, training, and experience in treating patients similarly situated to Ms. Rendon, they are qualified to render an opinion on the standard of care at issue in this case. *See Sanjar*, 252 S.W.3d at 465; *see also Blan v. Ali,* 7 S.W.3d 741, 746–47 (Tex.App.-Houston [14th Dist.] 1999, no pet.) (holding, in a summary judgment case, that an expert physician-witness in a healthcare liability case need not practice medicine in the same field as the defendant physician but only establish they are qualified to render an opinion on the condition involved in the claim).

**2. Dr. Castillo's Qualification Challenge**

Dr. Castillo only challenges the qualifications of Dr. Edlich. In support of his position, Dr. Castillo argues the medical services relevant to appellees' claims "are the services provided by an infectious diseases consultant requested to provide *specialized* knowledge about the management of antibiotic therapy for a patient following abdominoplasty and to *assume in lieu of the attending plastic surgeon* the antibiotic therapy for the patient." Dr. Castillo then goes on to conclude that since Dr. Edlich is a plastic surgeon and not an infectious disease specialist, Dr. Edlich is not qualified to render an expert opinion against him.

While Dr. Castillo is correct Dr. Edlich is a plastic surgeon and not an infectious disease specialist, we do not agree this fact automatically precludes Dr. Edlich from rendering an expert opinion against an infectious disease expert. *See Broders v. Heise,* 924 S.W.2d 148, 154 (Tex.1996) (applying predecessor statute). In his report, Dr. Edlich states: "I have treated many patients with the same condition as [Ms.] Rendon. I have performed diastasis recti abdominoplasty surgery on numerous occasions. I have also diagnosed and treated patients who have been diagnosed as having necrotizing fasciitis." For the same reasons we found Dr. Bakken and Dr. Marik qualified to render an opinion relative to Dr. Kelly, we hold Dr. Edlich is qualified to render an opinion regarding Dr. Castillo's treatment of Ms.

Rendon. *See Sanjar,* 252 S.W.3d at 465; *see also Blan,* 7 S.W.3d at 746–47.

### 3. Dr. Annamaneni's Qualification Challenges

■ Dr. Annamaneni, a pulmonologist and critical care specialist, challenges the qualifications of each of appellees' physician experts to render expert opinions against him.[2] According to Dr. Annamaneni, the medical services relevant to appellees' claims against him are the services provided by a pulmonologist/critical care specialist practicing in a private as opposed to a public hospital who was consulted by the operating plastic surgeon to evaluate a patient in multi-system organ failure and to manage that patient's hemodynamics and who then brought in an infectious disease specialist to evaluate, manage, and treat a suspected infectious process.

■ Based on that statement of the medical services at issue, Dr. Annamaneni then contends Dr. Weinberg, Dr. Edlich, and Dr. Bakken all lack the training, education, and experience to serve as medical experts against him.[3] For the reasons stated in sections III(A)(1) and (2) above, we disagree these doctors are not qualified to render an opinion against Dr. Annamaneni. Dr. Annamaneni also asserts that Dr. Marik, a pulmonologist and critical care specialist like himself, is not qualified to render an opinion in this suit because he practices in a large, public hospital setting as opposed to a private hospital setting. Dr. Annamaneni does not cite any legal authority for this unique argument, and we are not persuaded the public or private

status of a hospital impacts the standard of care expected of a doctor practicing in that hospital.

■ Finally, Dr. Annamaneni contends appellees' physician experts are not qualified under the statute because they are not licensed in the State of Texas. Because the plain language of the statute defines "physician" to include a person licensed to practice medicine in one or more states in the United States and each of appellees' physicians meets that requirement, we refuse to find them unqualified on that basis. Tex. Civ. Prac. & Rem.Code Ann. § 74.401(g)(1). Having addressed each of Dr. Annamaneni's qualification arguments, we hold that Dr. Edlich, Dr. Bakken, and Dr. Marik are qualified to render an expert opinion against Dr. Annamaneni. *See Sanjar,* 252 S.W.3d at 465; *see also Blan,* 7 S.W.3d at 746–47.

### B. *Appellees' Nurse Experts*

■ In addition to the reports of the four physicians, appellees also filed reports prepared by two nurses. Each appellant challenges these reports by pointing out that nurses are not qualified under the statute to render expert opinions on the issue of causation. We agree with appellants that, under the statute, a nurse is not qualified to render an opinion on medical causation. Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(5)(C). Accordingly, the reports of Nurse Shumaker and Nurse Ruth–Sahd, standing alone, can not meet the statutory report requirement on medical causation. *Id.* However, this does not end our analysis because appellees filed

---

2. In the same issue on appeal, Dr. Annamaneni also challenges the qualifications of appellees' two nurse experts to render expert opinions against him. We address that contention below in section III(B).

3. Because Dr. Weinberg addresses only Dr. Kelly's treatment of Ms. Rendon and does not name Dr. Annamaneni in his expert report, his opinions cannot be used against Dr. Annamaneni. Therefore, we need not reach the issue of whether Dr. Weinberg is qualified to render an opinion against Dr. Annamaneni.

physician reports in addition to the reports prepared by the nurses.

 In the present case, Dr. Edlich, Dr. Bakken, and Dr. Marik reviewed the report of Nurse Ruth–Sahd and incorporated it by reference into their own reports. Each physician then relied on Ruth–Sahd's report in rendering their own opinions regarding the standard of care and medical causation as it applies to Houston Northwest. While a nurse's report, standing alone, is inadequate to meet the requirements of the statute as to medical causation, nothing in the health care liability statute prohibits an otherwise qualified physician from relying on a nurse's report in the formation of the physician's own opinion. *See* Tex.R. Evid. 703 (stating an expert may base his opinion on facts or data that is not admissible in evidence if it is of a type reasonably relied on by experts in that particular field); *see also Packard v. Guerra*, 252 S.W.3d 511, 532–33 (Tex.App.-Houston [14th Dist.] 2008, no pet. h.) (holding physician experts could rely on the expert opinion of an attorney in the formation of their own opinions regarding the standard of care and causation). Because Dr. Edlich, Dr. Bakken, and Dr. Marik incorporated Nurse Ruth–Sahd's report into their own and relied on it in the formation of their opinions regarding the standard of care and causation as it applies to Houston Northwest, we conclude the trial court did not abuse its discretion in considering Nurse Ruth–Sahd's report in its determination of Houston Northwest's motion to dismiss since it had become part of the reports of appellees' physician experts.

We overrule appellants' issues challenging the qualifications of appellees' expert witnesses.[4]

## IV. Did Appellees' Expert Reports Fail To Address Any Appellants?

 Dr. Castillo, Dr. Annamaneni, and Houston Northwest point out that Dr. Weinberg does not address their role in the events underlying this lawsuit. Dr. Castillo also complains Dr. Marik does not address Dr. Castillo's role in his report. Appellants are correct that Dr. Weinberg's report does not address any appellant's actions except those of Dr. Kelly, and Dr. Marik does not address Dr. Castillo. Therefore, if these two reports were the only reports filed by appellees, then the trial court would have abused its discretion in finding appellees had met the statutory expert report requirement as to each appellant. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a) (requiring a health care liability plaintiff to serve an expert report addressing each physician or health care provider defendant). However, there is no requirement that a health care liability plaintiff file a single, all encompassing report. *Id.* § 74.351(i). Here, in addition to Dr. Weinberg's and Dr. Marik's reports, appellees filed expert reports by two other physicians, as well as two nurses. Thus, when all of appellees' expert reports are considered together, they address all appellants. Therefore, the fact Dr. Weinberg's report addressed only Dr. Kelly and Dr. Marik's ignored Dr. Castillo, is of no benefit to appellants. *Packard*, 252 S.W.3d at 526–27.

We overrule appellants' issues arguing the trial court abused its discretion based

---

**4.** The fact we agree with appellants that Nurse Shumaker's report, standing alone, cannot address the issue of medical causation, does not change our holding overruling appellants' issues challenging the qualifications of appellees' experts because appellees filed adequate reports which address medical causation in addition to the report of Nurse Shumaker. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(i) (stating there is no requirement that a health care liability plaintiff file a single, all encompassing report).

on the fact each of appellees' expert reports do not address every appellant.

## V. Are Appellees' Expert Reports Deficient Because They Do Not Adequately Address The Standard Of Care And Causation?

Appellants contend appellees' expert reports are deficient on the issues of the standard of care[5] and causation because they are conclusory and do not specifically address each appellant. Because Dr. Edlich is qualified to render an opinion as to the liability of each appellant, for reasons of judicial economy, we initially focus our analysis on his report and will only examine the sufficiency of the remaining expert reports if we determine Dr. Edlich's report is deficient on the issues of the standard of care and causation.

### A. Is Dr. Edlich's Expert Report Deficient?

The physician appellants generally assert Dr. Edlich's expert report is conclusory because it lacks sufficient specific factual detail to adequately apprise appellants of the basis of appellees' claims against them as to the standard of care.[6] With regard to causation, appellants complain appellees' expert reports are deficient because they only collectively address causation and fail to link their causation opinions to specific facts thus rendering them conclusory.

Dr. Edlich filed a twenty-six page report detailing his opinions regarding the care and treatment Ms. Rendon received from appellants. Dr. Edlich stated that, in the preparation of his report, he reviewed Ms. Rendon's death certificate, Ms. Rendon's autopsy reports, and medical records from Houston Northwest, Dr. Kelly, and Kelsey Seybold Clinic, Willowbrook. Dr. Edlich's report contains a section titled "Summary of Facts" that details, almost hour by hour, the events underlying this lawsuit beginning with Ms. Rendon's initial consultation with Dr. Kelly, continuing through the tummy tuck procedure, her post-surgical care, and concluding with her death less than five days after the surgery. This summary includes Ms. Rendon's condition throughout that time period.[7] Dr. Edlich

---

5. Houston Northwest does not raise any standard of care complaints on appeal.

6. In addition to a failure to state exactly what the standard of care was and what each appellant should have done differently to comply with that standard, examples of appellants' specificity complaints include: (1) a failure to specify which antibiotics appellants should have ordered for Ms. Rendon; (2) the timing for the administration of those antibiotics; (3) the exact time during Ms. Rendon's hospitalization when her necrotizing fasciitis became irreversible; and (4) morbidity and mortality rates for patients similarly situated to Ms. Rendon. Appellants do not cite any authority in support of their position that a section 74.351 report requires the type of *extreme detail listed above to give defendants notice of the basis of the claims against them* and we are not persuaded the statute dictates such a level of detail. Accordingly, we reject appellants' request to require that level of detail in a section 74.351 expert report.

7. As an example of the level of detail found in Dr. Edlich's report, we include a small excerpt here:

 On post op day # 2 (11/03/04), Ms. Rendon's condition severely worsened. At midnight, she continued to have fever of 101.9, followed by nausea and vomiting at 0045, dark concentrated urine with increased burning abdominal pain noted at 0215, and decreased oxygen saturation of 94% at 0400 with further decrease to 93% at 0500. At 0645, the nurse assessed that Ms. Rendon's lungs were congested and her urine continued to be dark and concentrated. The patient complained of weakness. At 0800, Ms. Rendon had further temperature elevation of 101.4 with increased tenderness of the abdomen and declining blood pressure of 100/50. No telephone call was made to Dr. Kelly by the nurses to report Ms. Rendon's deteriorating condition. Finally, at 1000 on 11/03/04, Dr. Kelly saw Ms. Rendon and documented that her continued

then lists multiple standards of care for diagnosing and treating patients demonstrating symptoms like Ms. Rendon's.[8] Dr. Edlich then embarks on a detailed explanation of how each appellant violated the required standard of care.[9] In the final section of his report, Dr. Edlich addresses causation. In the causation section, Dr. Edlich begins by generally stating that, as a result of their deviations from the standard of care, each individually named appellant caused Ms. Rendon's death. Dr. Edlich then provides a more detailed analysis explaining how each separate appellant's violations of the standard of care caused Ms. Rendon's death.[10]

> fever was caused by her getting out of bed. Dr. Kelly wrote, "Temp spike to 101 after she got up. This is commonly seen when pts get up." Dr. Kelly ordered no diagnostic tests, but merely discontinued the Tylenol # 3, started Vicodin for pain, and Keflex antibiotic therapy.

8. We include an example of one of the standards of care listed by Dr. Edlich:

> Standard of Care requires that postoperatively patients be assessed for signs and symptoms of infection to ensure early diagnosis and appropriate treatment. Success of treatment of necrotizing fasciitis depends upon this assessment and early treatment of this condition.
> - The most common presenting symptom of necrotizing fasciitis is pain out of proportion to the local inflammatory response noted by the patient.
> - The patient must be closely monitored for signs and symptoms of infection, including fever, elevated white blood cell count, pain out of proportion to the operative procedure, lethargy, quickly spreading erythema of the wound, and progressive anesthesia at the site of infection.
> - Early clinical diagnosis of group A Strep necrotizing infection can be made by taking a careful history of the patient and performing an MRI with aspiration biopsy.
> - For patients with symptoms of necrotizing fasciitis, the standard of care mandates that the wound site be immediately assessed as the possible site for infection.

9. We include an example of a specific violation of the standard of care as it applies to Dr. Kelly:

> Dr. Kelly breached the standard of care when he failed to adequately assess Ms. Rendon on the night of 11/02/04 when she developed fever of 101.3 at 2115. Standard of care requires prompt assessment, workup, and treatment of a post surgical patient who develops this type of elevated temp within the first post op day.
> - Upon a report of this high of fever on post op day # 1, standard of care required that Dr. Kelly go to the hospital immediately to assess Ms. Rendon's condition and her post op wound, order diagnostic lab tests, order intravenous empiric broad spectrum antibiotic therapy, perform an MRI and/or CT scan for evaluation of the abdomen, and, if infection were found, take Ms. Rendon back to surgery for debridement and drainage of the wound.
> - Instead, Dr. Kelly merely ordered Tylenol per phone order. He did not order any tests or IV antibiotic therapy, and he did not return to the hospital to assess Ms. Rendon.

10. Dr. Edlich's causation opinion as to Dr. Kelly is quoted here in its entirety:

> Dr. Kelly failed to properly assess the condition of Yolanda Leal Rendon prior to performing surgery on 11/02/04. Dr. Kelly used surgical techniques that increased Ms. Rendon's risk for acquiring an infection at Houston Northwest Medical Center, including use of inadequate preoperative scrub, improper use of hospital equipment, lack of appropriate pre-operative antibiotic therapy and improper closure of the surgical wound. Dr. Kelly then delayed in assessment of Ms. Rendon's condition on 11/02/04, one day after surgery, when she developed a high fever. He did not order diagnostic tests on 11/02/04 to determine the cause of her elevated temperature, which was an indicator of Strep A infection in a postoperative patient less than 24 hrs after surgery. By 11/03/2004, Dr. Kelly again failed to recognize the rapidly deteriorating condition of Ms. Rendon with signs and symptoms of elevated white blood cell

 The two-fold purpose of an expert report under section 74.351 is to inform the defendants of the specific conduct the plaintiff has called into question, and to provide the trial court with a basis to determine whether or not the plaintiff's claims have merit. *Patel v. Williams*, 237 S.W.3d 901, 906 (Tex.App.-Houston [14th Dist.] 2007, no pet.). Pursuant to this standard, we conclude Dr. Edlich's report is not deficient as it addresses the standard of care in sufficient detail to apprise each appellant of appellees' complaints regarding their alleged violations of the standard of care. Further, we conclude, with regard to his causation opinions, Dr. Edlich's report specifically addresses each appellant and links his causation opinions to specific facts such that each appellant had notice of the complaints against them. Therefore, keeping in mind that expert reports, such as that of Dr. Edlich, are simply a preliminary method to show a plaintiff has a viable cause of action that is not frivolous or without expert support, we hold the trial court did not abuse its discretion when it denied appellants' motions to dismiss based on their complaints that appellees' expert reports were deficient as to the standard of care and causation elements.[11] *Id.* Because we have deter-

count, critical levels of bands in the CBC (left shift indicating bacterial infection), lethargy, decreased urine output, and critically low blood pressure. Dr. Kelly did not appropriately treat this condition, perform the proper diagnostic tests for determination of causation of the infection, refer Ms. Rendon in a timely manner to a surgeon for consultation, nor did he take Ms. Rendon back for exploratory surgery. In addition, on 11/04/2004, when Ms. Rendon's only hope for survival was to be taken back to surgery for exploration and debridement of the postoperative abdominal wound along with administration of aggressive antibiotic therapy, Dr. Kelly merely aspirated fluid near the incision cite, without use of an MRI, and sent the specimen to the lab for testing.

Research supports that the most important predictor of morbidity and mortality in this severe life threatening infection is the time interval between the onset of symptoms and definitive surgical therapy. Necrotizing fasciitis is a progressive, rapidly spreading inflammatory infection located in the deep fascia, causing secondary necrosis of the subcutaneous tissues. For treatment of necrotizing fasciitis to be successful, this condition must be diagnosed early on with administration of broad-spectrum antibiotics and rapid surgical debridement of the involved area. Once necrotizing fasciitis is suspected as being present, the patient should be immediately taken to the operating room to open up the surgical wound and debride the infected tissue.

Dr. Kelly should have been alert to the methods to diagnose serious surgical wound infections, like necrotizing fasciitis, which include: a diagnostic incision to search for infection, ultrasound of the wound, as well as an MRI of the wound. If Dr. Kelly had ordered an MRI exam as early as 11/02/04, he would have diagnosed the abdominal infection of Ms. Rendon. With early diagnosis of this infection, Ms. Rendon could have received appropriate therapy, which would have saved her life. The MRI would have permitted the visualization of soft tissue edema in the fascial planes of the abdomen for localization of necrotic tissue and fluid accumulation. With this early diagnosis of suspected Group A infection, Ms. Rendon could have received immediate appropriate treatment, including antibiotic therapy, surgical debridement of the wound with excision of devitalized tissue, bacteriologic analysis of the wound, and appropriate antibiotic therapy followed by open wound management.

11. Appellants cite a litany of cases they contend support their contention that appellees' expert reports are deficient in their standard of care and causation opinions. We disagree as all of the cases can be distinguished from the present case. Most can be distinguished because, unlike the present case where the trial court denied appellants' motions to dismiss, the trial court in the cited cases granted the defendants' motions to dismiss and the appellate courts found the trial court's dismissal of the plaintiff's claims for deficient expert reports was within the trial court's discretion. *See Bowie Mem'l Hosp. v. Wright,*

mined Dr. Edlich's report meets the statutory requirements as to each appellant, we need not address appellants' complaints regarding the other expert reports filed by appellees on the issues of the standard of care and causation. Tex.R.App. P. 47.1.

We overrule appellants' issues asserting the trial court abused its discretion when it denied appellants' motions to dismiss because appellees' expert reports are deficient as to the standard of care and causation.

**VI. Were Appellees' Expert Reports Deficient Because They Did Not Address Each Autopsy Report Prepared By Dr. Chen?**

Houston Northwest complains appellees' expert reports are deficient because they do not address the causes of death found in each of the three autopsy reports drafted by Dr. Chen, the pathologist who conducted Ms. Rendon's autopsy.

Dr. Chen conducted an autopsy of Ms. Rendon on November 7, 2004. Subsequent to the actual autopsy, Dr. Chen issued three reports on his findings as a result of that autopsy. His provisional

79 S.W.3d 48 (Tex.2002) (affirming trial court's dismissal of plaintiff's claims); *Am. Transitional Care Ctr. of Tex., Inc. v. Palacios*, 46 S.W.3d 873 (Tex.2001) (same); *Apodaca v. Russo*, 228 S.W.3d 252 (Tex.App.-Austin 2007, no pet.) (same); *Talmore v. Baptist Hosp. of Southeast Tex. d/b/a Mem'l Hermann Hosp.*, No. 09–06–024–CV, 2006 WL 2883124 (Tex. App.-Beaumont Oct.12, 2006, no pet.) (mem. op.) (same); *Lopez v. Sinha*, No. 14–05–00606–CV, 2006 WL 2669355 (Tex.App.-Houston [14th Dist.] Sept. 19, 2006, no pet.) (mem.op.) (same); *Clark v. HCA, Inc.*, 210 S.W.3d 1 (Tex.App.-El Paso 2005, no pet.) (same); *Gray v. CHCA Bayshore, L.P.*, 189 S.W.3d 855 (Tex.App.-Houston [1st Dist.] 2006, no pet.) (same); *Longino v. Crosswhite*, 183 S.W.3d 913 (Tex.App.-Texarkana 2006, no pet.) (same); *Hardy v. Marsh*, 170 S.W.3d 865 (Tex.App.-Texarkana 2005, no pet.) (same); *Taylor v. Christus Spohn Health Sys. Corp.*, 169 S.W.3d 241 (Tex.App.-Corpus Christi 2004, no pet.) (same); *Costello v. Christus Santa Rosa Health Care Corp.*, 141 S.W.3d 245 (Tex.App.-San Antonio 2004, no pet.) (same); *Russ v. Titus Hosp. Dist.*, 128 S.W.3d 332 (Tex.App.-Texarkana 2004, pet. denied) (same); *Hawkins v. Gomez*, No. 01–02–01195–CV, 2004 WL 306077 (Tex.App.-Houston [1st Dist.] Feb. 19, 2004, no pet.) (mem.op.) (same); *Strom v. Mem'l Hermann Hosp. Sys.*, 110 S.W.3d 216 (Tex.App.-Houston [1st Dist.] 2003, pet. denied) (same); *Villa v. Hargrove*, 110 S.W.3d 74 (Tex.App.-San Antonio 2003, pet. denied) (same); *Kirksey v. Marupudi*, No. 07–03–0076–CV, 2003 WL 23096028 (Tex.App.-Amarillo Dec. 30, 2003, no pet.) (mem.op.) (same); *Leston v. Cwikla*,

No. 05–02–01712–CV, 2003 WL 22332371 (Tex.App.-Dallas Oct. 14, 2003, rule 53.7(f) motion granted)(mem.op.) (same); *Shaw v. BMW Healthcare, Inc.*, 100 S.W.3d 8 (Tex. App.-Tyler 2002, pet. denied) (same); *Nichols v. Nacogdoches Hosp. Dist.*, 96 S.W.3d 582 (Tex.App.-Tyler 2002, no pet.) (same); *De Leon v. Vela*, 70 S.W.3d 194 (Tex.App.-San Antonio 2001, pet. denied) (same); *Rittmer v. Garza*, 65 S.W.3d 718 (Tex.App.-Houston [14th Dist.] 2001, no pet.) (same); *Hightower v. Saxton*, 54 S.W.3d 380 (Tex.App.-Waco 2001, no pet.) (same). The remaining cases cited by appellants can be factually distinguished. See *CHCA Mainland, L.P. v. Burkhalter*, 227 S.W.3d 221 (Tex. App.-Houston [1st Dist.] 2007, no pet.) (appellate court reversed holding the trial court abused its discretion when it denied defendant's motion to dismiss because the plaintiff's expert reports completely failed to address the hospital defendant's standard of care or the breaches of those standards); *Wells v. Ashmore*, 202 S.W.3d 465 (Tex.App.-Amarillo 2006, no pet.) (appellate court reversed holding the trial court abused its discretion when it denied defendant's motion to dismiss because the plaintiff's expert reports failed to include any facts connecting the expert's conclusions with the breaches of the standard of care); *Methodist Health Care Sys. of San Antonio, Ltd. v. Martinez–Partido*, No. 04–05–00868–CV, 2006 WL 1627844 (Tex.App.-San Antonio June 14, 2006, pet. denied) (appellate court reversed holding the trial court abused its discretion when it denied defendant's motion to dismiss because the plaintiff's experts were not qualified).

report was issued the same day the autopsy was conducted. In his provisional report, Dr. Chen opined Ms. Rendon died as the result of multiple occlusive pulmonary thromboemboli. Dr. Chen's final report was issued on January 19, 2005. In that report, Dr. Chen gave the cause of Ms. Rendon's death as lethal levels of ephedrine. However, despite the classification of the January 19, 2005 report as his final report, Dr. Chen issued a supplemental report on September 14, 2006. In his September 14, 2006 report, Dr. Chen states the reason he issued the supplemental report was to "render the final cause of death as complications from necrotizing fasciitis."

■ Houston Northwest argues appellees' expert reports are deficient because they did not address each of Dr. Chen's reports and each of his conclusions as to the cause of Ms. Rendon's death. Here, Dr. Chen issued a supplemental report in which he rendered his final opinion that Ms. Rendon's death was caused by complications from necrotizing fasciitis. Each of appellees' physician experts noted they reviewed Dr. Chen's autopsy reports in the preparation of their opinions and addressed necrotizing fasciitis as the cause of Ms. Rendon's death. Houston Northwest does not cite any legal authority that requires an expert, in a section 74.351 preliminary report, to specifically address every autopsy report found in the medical records, particularly reports that have been supplanted by later reports. Because appellees' experts reviewed Dr. Chen's autopsy reports in the preparation of their opinions in this case and addressed the final cause of death, necrotizing fasciitis, we hold the reports meet the statutory requirements. We overrule Houston Northwest's issue on appeal based on the autopsy reports.

## VII. Appellants Are Not Entitled To An Award Of Their Attorney's Fees and Costs

■ Dr. Annamaneni contends the trial court abused its discretion when it did not award appellants their reasonable attorney's fees and costs pursuant to section 74.351(b)(1). Tex. Civ. Prac. & Rem.Code Ann. § 74.351(b)(1). Because we have determined the trial court did not abuse its discretion when it denied appellants' motions to dismiss, appellants were not entitled to their reasonable attorney's fees and costs. We overrule Dr. Annamaneni's issue on appeal contending appellants were entitled to an award of their attorney's fees and costs.

### CONCLUSION

Having addressed and overruled all issues raised by appellants in this appeal, we affirm the trial court's order denying each appellant's motion to dismiss.