**Affirmed and Opinion Filed April 12, 2016**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-15-01083-CV

## NEXION HEALTHCARE MANAGEMENT, INC. D/B/A DUNCANVILLE HEALTHCARE AND REHABILITATION CENTER, Appellant
## V.
## MARIA SOSA, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF NICOLAS RUBEN SOSA, Appellee

**On Appeal from the 14th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-15-01708**

## MEMORANDUM OPINION
Before Justices Bridges, Francis, and Myers
Opinion by Justice Bridges

Appellant Nexion Healthcare Management, Inc. d/b/a Duncanville Healthcare and Rehabilitation Center filed a motion to dismiss pursuant to chapter 74 of the Texas Civil Practice and Remedies Code based on the expert report filed by appellee Maria Sosa, individually and on behalf of the Estate of Nicolas Ruben Sosa. The trial court denied the motion. On appeal, Duncanville argues the trial court abused its discretion by denying its motion to dismiss because the doctor was unqualified to give an opinion and his opinion did not sufficiently identify causation. We affirm the trial court's order.

### Background

Nicolas Sosa was admitted to Duncanville on June 28, 2013. At the time, he suffered from hypertension, altered mental state, congestive heart failure, chronic kidney disease stage IV,

high cholesterol, respiratory failure, diabetes, dementia, encephalopathy, depression, COPD, and difficulty swallowing. Because of his swallowing problems, Mr. Sosa was fed by a gastrostomy tube into his stomach. On admission to Duncanville, Mr. Sosa weighed 165 pounds. On July 8, 2013, a registered dietician performed a nutritional assessment and recommended his tube feedings be changed to increase his caloric intake. However, the dietician did not have Mr. Sosa's weight and could not do an accurate assessment of his nutritional needs. Regardless, Mr. Sosa maintained his weight through July 27, 2013. However, on August 5, 2013, he weighed 149, which represented a nine percent loss in body weight in less than two weeks. Documentation by the nursing staff was inaccurate in many ways making it impossible to accurately determine how and when Mr. Sosa was being fed, but it appeared nursing staff failed to feed him on July 10, July 11, and July 12.

On July 18, 2013, the dietician determined Mr. Sosa was not receiving adequate hydration and requested an increase in fluids and food. She made this determination based on lab results showing elevated Creatinine and Blood Urea Nitrogen (BUN) levels. Records also indicated Mr. Sosa was given Lasix, a diuretic which exacerbates dehydration, despite a doctor's order to stop the medication.

Around 9 a.m. on August 6, 2013, nursing staff noted Mr. Sosa had poor posture, low blood pressure, and increased tiredness. At 11:30 a.m., Mr. Sosa's blood sugar was high, but he did not receive insulin. Mr. Sosa was found unresponsive in his room at 2:30 p.m. and immediately transported to the hospital. The emergency room doctor told Sosa her husband was brain dead; however, doctors resuscitated his heart and put him on a ventilator. Hospital records indicated Mr. Sosa was suffering from kidney failure, sepsis, bloody and cloudy urine, and aspiration pneumonia. Mr. Sosa died the next day after life support was removed.

Sosa filed suit alleging Duncanville acted negligently by (1) failing to properly supervise a patient under its care; (2) failing to properly monitor a patient under its care; (3) leaving a patient unattended; (4) failing to reasonably ensure the safety of a patient under its care; and (5) failing to provide the care a reasonable and prudent nursing home provider should have provided. Dr. Michael Zeitlin and Donna du Bois, MPH, RN filed expert reports in support of Sosa's claims. Duncanville objected to both reports and argued neither person was qualified to provide an expert opinion and Dr. Zeitlin failed to provide a causal relationship between Duncanville's alleged actions and Mr. Sosa's death. The trial court denied the motion, and this appeal followed.

## Standard of Review and Applicable Law

We review a trial court's decision on a motion to dismiss under section 74.351 of the Texas Civil Practice and Remedies Code for an abuse of discretion. *Strobel v. Marlow*, 341 S.W.3d 470, 473 (Tex. App.—Dallas 2011, no pet.). The trial court abuses its discretion if it acts unreasonably, arbitrarily, or without reference to any guiding rules or principles. *Kelly v. Rendon*, 255 S.W.3d 665, 672 (Tex. App.—Houston [14th Dist.] 2008, no pet.). We may not reverse a trial court's discretionary ruling simply because we may have decided it differently. *Id*.

Trial courts are instructed that they "shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with [the Act.]" TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l) (West Supp. 2015). Under the statute, the expert report must provide a "fair summary" of the expert's opinions regarding applicable standards of care, the manner in which the care rendered by the defendant physician or healthcare provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed. *Id*. § 74.351(r)(6).

The causation requirement is met if the report explains the basis of the expert's statements, linking his conclusions to the facts. *Christus Spohn Health Sys. Corp. v. Lackey*, No. 13-10-00222-CV, 2010 WL 3279706, at *2 (Tex. App.—Corpus Christi Aug. 19, 2010, no pet.) (mem. op.). Causation may not be inferred; therefore, a conclusory report does not meet the statutory requirements of chapter 74. *See Castillo v. August*, 248 S.W.3d 874, 883 (Tex. App.—El Paso 2008, no pet.); *see also Lackey*, 2010 WL 3279706, at *2.

An expert report need not marshal all of the plaintiff's proof, but it must include the expert opinion on each of the elements identified in the statute. *Kelly*, 255 S.W.3d at 672. The report must provide only enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct the plaintiff has called into question and (2) it must provide a basis for the trial court to conclude that the claims have merit. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001); *Kelly*, 255 S.W.3d at 672.

In deciding whether the statutory standard has been met, the trial court examines only the four corners of the expert's report and curriculum vitae (CV). *Kelly*, 255 S.W.3d at 672. A court may not fill gaps in a report by drawing inferences or guessing what the expert meant or intended. *Austin Heart, P.A. v. Webb*, 228 S.W.3d 276, 279 (Tex. App.—Austin 2007, no pet.).

**Is Dr. Zeitlin Qualified to Give an Expert Opinion?**

In its second issue, Duncanville argues the trial court abused its discretion by denying its motion to dismiss because Dr. Zeitlin's report and CV fails to show he is qualified to give expert opinions. Duncanville asserts Dr. Zeitlin failed to satisfy the requirements of section 74.402(a)(2) because he has never practiced health care in a nursing home and his report does not demonstrate he "has other substantial training or experience in providing nursing care to nursing home residents." Duncanville also argues because he has no experience working in a

–4–

nursing home, he does not actively practice healthcare "in rendering health care services relevant to Plaintiff's claim" as required by section 74.402(c)(2).

In determining whether a witness is qualified on the basis of training or experience, the trial court considers whether, at the time the claim arose or at the time the testimony is given, the witness (1) is certified by a licensing agency of one or more states or a national professional certifying agency or has other substantial training or experience in the area of health care relevant to the claim, and (2) is actively practicing health care in rendering health care services relevant to the claim. TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(c). "Practicing health care" includes: (1) training health care providers in the same field as the defendant health care provider at an accredited educational institution; or (2) serving as a consultant health care provider and being license, certified, or registered in the same field as the defendant health care provider. *Id*. § 74.402(a).

Although Duncanville argues Dr. Zeitlin is unqualified to give an expert opinion because he has no training or experience in a nursing home, the relevant question is not so narrow. Rather the broader question is whether he is knowledgeable through his training and experience to opine on the causal relationship between the alleged departure from the accepted standards of care and the injuries suffered by an elderly and infirm person. *See Christian Care Ctrs., Inc. v. Golenko*, 328 S.W.3d 637, 644 (Tex. App.—Dallas 2010, pet. denied) (noting relevant question was whether nursing home staff should have recognized patient's condition and not whether expert doctor had worked in a nursing home); *IHS Acquisition No. 140, Inc. v. Travis*, No. 13-07-481-CV, 2008 WL 1822780, at *5 (Tex. App.—Corpus Christi Apr. 24, 2008, pet. denied) (mem. op.).

Dr. Zeitlin's CV states he is "actively practicing medicine and rendering medical care services relevant to the issues presented in Nicolas Sosa's claim." He is board certified in family

practice and geriatric medicine. During his geriatric fellowship training, he worked at the Jewish Home for the Ageing, described as providing "acute care for the elderly" and "skilled nursing facility." In addition, he had staff privileges at Warm Springs Long Term Acute Care Hospital during the relevant time. Since 2003, he has served as the chairman of the Geriatric Medicines Sub-committee of the Bexar County Medical Society. He is a member of the American Geriatrics Society and serves as a "Developmental Consultant, PACE de Bexar (Program for the All Inclusive Care for the Elderly) Bexar County Medical Society." Dr. Zeitlin has authored papers on issues pertaining to the elderly and given multiple lectures on such geriatric topics including "Parenteral Feeding in Long Term Care, Ethical and Technical Considerations," "Pressure Ulcers," "Wellness for Older Adults," "Introduction to Geriatric Medicine," and "Gait Instability & Falls in the Elderly."

Dr. Zeitlin's CV demonstrates he has the necessary training and experience to qualify as an expert under section 74.402. Accordingly, the trial court did not abuse its discretion by determining Dr. Zeitlin was qualified to provide an expert opinion. We overrule Duncanville's second issue.

**Did Dr. Zeitlin's Report Sufficiently Identify Causation?**

In its first issue, Duncanville argues the trial court abused its discretion by denying its motion to dismiss because Dr. Zeitlin's report is nothing more than conclusory statements that fail to explain how or why Duncanville's conduct led to Mr. Sosa's death. Sosa responds, viewing the report in its entirety, the report provides several specific acts of negligence that caused Mr. Sosa's death and adequately puts Duncanville on notice of the claims against it.

Before considering Dr. Zeitlin's report, we must first address Duncanville's argument that we may not consider the expert report of Donna du Bois, MPH, RN in our analysis. Duncanville acknowledges that multiple expert reports may be considered in determining

–6–

whether a claimant has satisfied the requirements of chapter 74. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(i). However, Duncanville argues du Bois's report cannot be used to supply a causation opinion because she is not a physician. *Id*. § 74.351(r)(5)(C) (stating a physician must render opinion on medical causation). We disagree.

"While a nurse's report, standing alone, is inadequate to meet the requirements of the statute as to medical causation, nothing in the health care liability statute prohibits an otherwise qualified physician from relying on a nurse's report in the formation of the physician's own opinion." *Kelly*, 255 S.W.3d at 676. In preparing his report, Dr. Zeitlin reviewed du Bois's report. Duncanville has not challenged on appeal du Bois's expert report explaining standard of care or breach of the standard of care. Thus, we are permitted, as was the trial court, to read Dr. Zeitlin's and du Bois's reports together in determining whether Sosa established the causal relationship between any negligence by Duncanville and the injuries suffered by Mr. Sosa. *Id*.; *see also Lackey*, 2010 WL 3279706 at *4.

In reviewing whether an expert report addresses the causal relationship between the health care provider's failure to meet the applicable standard of care and the injury, there are no "magical words" required to establish causation. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 53 (Tex. 2002). Rather, a causal relationship is established by proof that the negligent act or omission was a substantial factor in bringing about the harm, and that absent the act or omission, the harm would not have occurred. *Nexion Health at Garland, Inc. v. Townsend*, No. 05-15-00153-CV, 2015 WL 3646773, at *4 (Tex. App.—Dallas June 12, 2015, pet. denied) (mem. op.). An expert may show causation by explaining a chain of events that begins with the defendant health care provider's negligence and ends in injury to the plaintiff. *McKellar v. Cervantes*, 367 S.W.3d 478, 485 (Tex. App.—Texarkana 2012, no pet.). While a claimant is not required to conclusively prove the case through preliminary expert reports, the reports may not merely state

conclusions but must link the causation opinions to the alleged breach. *Townsend*, 2015 WL 3646773, at *4.

Dr. Zeitlin, relying on Mr. Sosa's death certificate, states Mr. Sosa died from anoxic encephalopathy from prolonged cardiac arrest, end state heart disease, and stage V chronic kidney disease. Duncanville argues the report does not explain how or why any of its alleged conduct caused these conditions.

Dr. Zeitlin, relying on du Bois's report, states Duncanville provided substandard care throughout Mr. Sosa's residency and did not meet his needs. Because of Duncanville's breach of the standard of care, Mr. Sosa "became malnourished and dehydrated, developed pressure sores, and died."

Dr. Zeitlin opines that Duncanville breached the standard of care by failing to properly manage Mr. Sosa's feeding tube and failing to properly manage his kidney disease, which resulted in dehydration thereby causing Mr. Sosa's kidneys to fail. Dr. Zeitlin notes there is "overwhelming evidence of neglect of Mr. Sosa's nursing and dietary needs," and explains that despite the dietician recommending an increase in his caloric intake on July 8, 2013, the dietician did not have his accurate weight, which is necessary to evaluate if he is at his ideal body weight and to determine his caloric needs. Dr. Zeitlin notes that documentation of Mr. Sosa's feedings are inaccurate making it impossible to determine how and when he was fed; however, the staff failed to feed him on July 10, July 11, and July 12. "This was a breach of the standard of care and deadly for Mr. Sosa who was fragile and completely dependent on staff for his feedings." At the time of his death, Mr. Sosa weighed 149 pounds, which represented a nine percent loss in body weight in a short period of time.

Dr. Zeitlin's report further explains lab results indicating Mr. Sosa was not receiving adequate hydration. On July 18, 2013, Mr. Sosa had elevated BUN and Creatinine levels, which Dr. Zeitlin explains as follows:

> Creatinine is a chemical waste molecule that is generated from muscle metabolism. It is filtered by the kidneys. The level of Creatinine in the blood is a reliable measure of the level of kidney function. A high Creatinine level is indicative of the kidneys not filtering as needed and the build up of waste in the blood. Mr. Sosa's Creatinine level was 3.4, which is over the normal range of .6 to 1.3. BUN is also a metabolic by-product which can build up if the kidney function is impaired. Mr. Sosa's BUN was 53, above the normal range of 7 to 18. BUN level is also a reliable indicator of dehydration, with the BUN increasing as a person becomes more dehydrated.

Dr. Zeitlin explains Duncanville's staff improperly gave Mr. Sosa Lasix, a diuretic that exacerbated his dehydration by removing excess fluid from the body. Nurse du Bois's report states that the staff gave Mr. Sosa Lasix twice a day beginning August 1, 2013, despite a July 1, 2013 order to hold the medication. She further explains the Lasix would have worsened his dehydration, and Lasix can easily become toxic in patients with renal disease and create electrolyte imbalances. Further, "[s]taff did not follow physician orders to monitor his intake and output and this was of critical importance due to his kidney disease since dehydration can lead to kidney failure even in someone with healthy kidneys." Monitoring Mr. Sosa's fluid intake was part of two care plans and "essential" to his kidney health. However, staff did not develop a care plan to address his kidney disease, despite knowing upon his admission that he suffered stage IV chronic kidney disease. Nurse du Bois's report explains that although most patients with stage IV renal disease are on dialysis, he had not yet required it. "Still his kidneys were badly damaged and staff needed to take every precaution to maintain they remained functioning . . . [b]ecause dehydration can lead to kidney failure."

Despite Mr. Sosa's July 18, 2013 lab results indicating dehydration and an order from the dietician to increase fluid intake, Mr. Sosa's dehydration worsened. On August 6, 2013, his BUN level reached 189, his Creatinine increased to 7.00, and his electrolytes were high. Dr. Zeitlin's report also states Mr. Sosa's Osmolality was 378, which he explains as follows:

> Osmolality is a test of the concentration of all chemical particles in the fluid of the blood. Normal range is from 260-280. A high Osmolality is indicative of dehydration, high levels of uremia waste in the blood, high blood sugar, and diabetes insipidus, a condition in which the kidneys are unable to prevent the excretion of water.

He then opines that Mr. Sosa's body could not survive with such stress on his kidneys and these lab reports "are indicative of acute kidney failure." He then concludes:

> The failures of the nursing staff of Duncanville Healthcare and Rehabilitation Center to manage his kidney disease and provide food and water as needed caused Mr. Sosa to become dehydrated and caused his kidneys to fail . . . Had the nursing staff properly managed Mr. Sosa's feeding tube and ensured that he received proper food and water, it is medically probable that his kidneys would not have failed and he would not have died August 7, 2013.

Reading Dr. Zeitlin's and du Bois's reports together, the reports address and link Dr. Zeitlin's causation opinion to specific facts such that Duncanville had notice of the complaints against it. He explained the chain of events that began with Duncanville's negligence—failing to follow orders to increase fluid intake, failing to provide any nutrition for three days, ignoring orders to stop giving Lasik and instead continuing the medicine twice a day, and failing to monitor intake and output—and resulted in Mr. Sosa's kidney failure, which partly led to his death. *See McKellar*, 367 S.W.3d at 485.

The two-fold purpose of an expert report under section 74.351 is to inform the defendants of the specific conduct the plaintiff has called into question and to provide the trial court with a basis to determine whether or not the plaintiff's claims have merit and are not frivolous. *Kelly*, 255 S.W.3d at 679. Dr. Zeitlin's report meets this standard. And while we acknowledge Dr.

–10–

Zeitlin's report details other acts of negligence possibly causing injury and contributing to Mr. Sosa's death, such as failing to discover his aspiration pneumonia and failing to prevent pressure sores on his hip and heel, we need not address them. *See Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013) (concluding a report that satisfies chapter 74, "even if as to one theory only, entitles the claimant to proceed with a suit against the physician or health care provider"). The trial court did not abuse its discretion by denying Duncanville's motion to dismiss. We overrule Duncanville's first issue

## Conclusion

We affirm the trial court's order.

/David L. Bridges/
DAVID L. BRIDGES
JUSTICE

151083F.P05

–11–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

NEXION HEALTH MANAGEMENT, INC.
D/B/A DUNCANVILLE HEALTHCARE
AND REHABILITATION CENTER,
Appellant

No. 05-15-01083-CV      V.

MARIA SOSA, INDIVIDUALLY AND ON
BEHALF OF THE ESTATE OF NICOLAS
RUBEN SOSA, Appellee

On Appeal from the 14th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-15-01708.
Opinion delivered by Justice Bridges.
Justices Francis and Myers participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is
**AFFIRMED**.

It is **ORDERED** that appellee MARIA SOSA, INDIVIDUALLY AND ON BEHALF
OF THE ESTATE OF NICOLAS RUBEN SOSA recover her costs of this appeal from appellant
NEXION HEALTH MANAGEMENT, INC. D/B/A DUNCANVILLE HEALTHCARE AND
REHABILITATION CENTER.

Judgment entered April 12, 2016.