NUMBER 13-10-00222-CV



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


CHRISTUS SPOHN HEALTH SYSTEM

CORPORATION D/B/A CHRISTUS 

SPOHN HOSPITAL CORPUS CHRISTI-

SHORELINE AND SULIK SHERIDAN 

ROCK PRAIRIE, INC., D/B/A SHERIDAN 

OF ROCK PRAIRIE, Appellants,


v.



RONNY LEE LACKEY, INDIVIDUALLY AND

AS INDEPENDENT EXECUTOR OF THE 

ESTATE MARGARET BAKER LACKEY, 

DECEASED, AND ON BEHALF OF ALL 

PERSONS ENTITLED TO RECOVER FOR 

THE DEATH OF MARGARET BAKER LACKEY, 

DECEASED; AND DAVID LACKEY, INDIVIDUALLY, 

AS WRONGFUL DEATH BENEFICIARY OF

MARGARET BAKER LACKEY, DECEASED, Appellees.

 


On appeal from the 28th District Court 

of Nueces County, Texas.

 


MEMORANDUM OPINION


Before Justices Rodriguez, Benavides, and Vela 


Memorandum Opinion by Justice Rodriguez



 In this accelerated appeal, appellants Christus Spohn Health System Corporation
d/b/a Christus Spohn Hospital Corpus Christi-Shoreline (Spohn) and Sulik Sheridan Rock
Prairie, Inc. d/b/a Sheridan of Rock Prairie (Sheridan) challenge the trial court's denial of
their motions to dismiss appellees Ronny Lee Lackey and David Lackey's (1) (the Lackeys)
health care liability claim for failure to file an adequate expert report as required by section
74.351. See Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a)-(b) (Vernon Supp. 2009). By
two issues, Christus Spohn argues that the trial court erred in denying its motion to dismiss
because: (1) the Lackeys' only timely expert report was authored by a nurse who was
statutorily unqualified to opine on causation, and (2) alternatively, the Lackeys' report
authored by a physician did not establish causation. By one issue, Sheridan also
challenges the causation element of the Lackeys' expert report. We affirm, in part, and
reverse and remand, in part.

I. Background

 The Lackeys brought both survival and wrongful death causes of action against
Spohn and Sheridan for alleged negligence in connection with their treatment of eighty-year-old Margaret Baker Lackey. While Margaret was a patient at Spohn for approximately
two weeks in April 2007, she developed pressure ulcers. On May 1, 2007, Margaret was
transferred to a nursing home operated by Sheridan, at which the Lackeys allege
Margaret's ulcers continued to worsen. Margaret was transferred to St. Joseph's Hospital
on May 25, 2007, where she eventually died on June 1, 2007. The Lackeys allege that
Spohn and Sheridan's failure to properly treat Margaret's pressure ulcers led to her death. Specifically, the Lackeys allege that Spohn and its employees failed to "institute
timely and appropriate treatment to stabilize or correct [Margaret]'s medical condition" and
failed to "ensure the staff adequately assessed, monitored and treated [Margaret] during
her hospitalization." The Lackeys allege that Sheridan and its employees failed to: 
"exercise the ordinary care and diligence of health care providers in their specialty";
"thoroughly perform continued physical assessments" and "prevent [Margaret] from
sustaining pressure sores"; "adequately assess" and "accurately report and document
[Margaret]'s symptoms, responses and status"; "provide necessary services in a timely
manner which placed [Margaret] at high risk for compromised care"; and "provide
appropriate intervention for [Margaret] who had exhibited a significant change in medical
condition." The Lackeys allege that, as a result of Spohn and Sheridan's negligence,
Margaret suffered pain and mental anguish during her life (the survival action). The
Lackeys also allege that the "untimely death" of Margaret caused them physical pain and
mental anguish (the wrongful death action). They seek "all pecuniary loss, loss of
inheritance, funeral and burial expenses, loss of care and maintenance, love, comfort,
support, advice, counsel, past and future emotional pain, mental anguish, torment, and
suffering due to the agonizing death of [Margaret]."

 Both Spohn and Sheridan answered the Lackeys' petition. The Lackeys then
served on Spohn and Sheridan an expert report authored by Frances Scholl Foster,
M.S.N., R.N. within 120 days of the filing of their lawsuit. Both Spohn and Sheridan filed
objections to the report and motions to dismiss, contesting the adequacy of Nurse Foster's
report under section 74.351. See id. § 74.351(r)(6). The trial court found Nurse Foster's
report deficient and sustained Spohn and Sheridan's objections but determined the report
was a good-faith effort, denied Spohn and Sheridan's motions to dismiss, and granted the
Lackeys a thirty-day extension to cure the deficiency. See id. § 74.351(c). Thereafter, the
Lackeys served the expert report of Lige B. Rushing, Jr., M.D. Spohn and Sheridan filed
another round of objections to Dr. Rushing's report and second motions to dismiss, arguing
that Dr. Rushing's report failed to adequately address causation. The trial court denied
Spohn and Sheridan's second motions to dismiss, and this appeal followed. See id. §
51.014(a)(9) (Vernon 2008) (authorizing an interlocutory appeal of the denial of a motion
to dismiss filed under section 74.351(b)). 

II. Standard of Review and Applicable Law

 We review a trial court's decision on a motion to dismiss under section 74.351 of the
civil practice and remedies code for abuse of discretion. Jernigan v. Langley, 195 S.W.3d
91, 93 (Tex. 2006); Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d 873,
878 (Tex. 2001). The trial court abuses its discretion if it acts unreasonably or arbitrarily
or without reference to any guiding rules or principles. Walker v. Gutierrez, 111 S.W.3d
56, 62 (Tex. 2003).

 Under section 74.351, a claimant must "serve on each party or the party's attorney"
an expert report and curriculum vitae "not later than the 120th day after the date the
original petition was filed." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a). An expert
report is "a written report by an expert that provides a fair summary of the expert's opinions
. . . regarding applicable standards of care, the manner in which the care rendered . . .
failed to meet the standards, and the causal relationship between that failure and the
injury, harm, or damages claimed." Id. § 74.351(r)(6). 

 A "fair summary" of the applicable standard of care and breach identifies the type
of care expected but not rendered. Palacios, 46 S.W.3d at 880. The causation
requirement is met if the report explains the basis of the expert's statement, linking his
conclusions to the facts. Bowie Mem'l Hosp. v. Wright, 79 S.W.3d 48, 52 (Tex. 2002). A
conclusory report does not meet the statutory test because it does not satisfy Palacios. 
Id. at 53. Causation may not be inferred. Castillo v. August, 248 S.W.3d 874, 883 (Tex.
App.-El Paso 2008, no pet.). 

 In our review of the expert report, we are limited to the four corners of the report in
determining whether the report manifests a good faith effort to comply with the statutory
definition of an expert report. Palacios, 46 S.W.3d at 878; see Tex. Civ. Prac. & Rem.
Code Ann. § 74.351(l) (requiring that the trial court "grant a motion challenging the
adequacy of the expert report only if appears to the court, after hearing, that the report
does not represent an objective good faith effort to comply" with the statutory definition). 
A court may not fill in gaps in a report by drawing inferences or guessing what the expert
meant or intended. Austin Heart, P.A. v. Webb, 228 S.W.3d 276, 279 (Tex. App.-Austin
2007, no pet.). But the report "need not marshal all the plaintiff's proof." Palacios, 46
S.W.3d at 878; Jernigan, 195 S.W.3d at 93. If the expert report puts the defendant on
notice of the specific conduct complained of and provides the trial court a basis on which
to conclude the claims have merit, the report represents a good-faith effort to comply with
the statute. Palacios, 46 S.W.3d at 879.

III. Discussion

A. Jurisdiction

 By its first issue, Spohn argues that the trial court erred in denying its motion to
dismiss because the Lackeys' only timely expert report was authored by Nurse Foster and
was, therefore, no report at all because a nurse is statutorily unqualified to opine on
causation. (2) See Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(5)(C). Spohn points to
cases from this Court and others holding that an expert report that omits any of the
statutory elements cannot be a good-faith effort. See Bowie Mem'l Hosp., 79 S.W.3d at
52; Palacios, 46 S.W.3d at 879; see also Alford v. Belacazar, No. 13-07-00657-CV, 2008
WL 3868114, at *2 (Tex. App.-Corpus Christi Aug. 21, 2008, no pet.) (mem. op.). Spohn
argues that, by the reasoning of those cases, Nurse Foster's report cannot be a good-faith
effort, and the trial court therefore erred in granting the Lackeys a thirty-day extension to
cure the deficiencies of the report. However, we decline to reach Spohn's argument
because we do not have jurisdiction over the issue.

 Whether a claimant is entitled to a thirty-day extension to cure a deficiency in its
expert report is a matter committed to the discretion of the trial court. Ogletree v.
Matthews, 262 S.W.3d 316, 320-21 (Tex. 2007); see McKeever v. Cerny, 266 S.W.3d 451,
455 (Tex. App.-Corpus Christi 2008, no pet.). Although section 51.014(a)(9) of the civil
practice and remedies code authorizes an interlocutory appeal from the denial of a health
care defendant's motion to dismiss based on the deficiency of an expert report, it also
provides that "an appeal may not be taken from an order granting a [thirty-day] extension
. . . ." Tex. Civ. Prac. & Rem. Code. § 51.014(a)(9) (emphasis added). The Texas
Supreme Court has clarified that "if a deficient report is served and the trial court grants a
thirty-day extension, that decision--even if coupled with a denial of a motion to dismiss--is
not subject to appellate review." Ogletree, 262 S.W.3d at 321; see McKeever, 266 S.W.3d
at 455. 

 Here, we conclude that the trial court acted within its discretion in finding the
Lackeys' report deficient but curable--although Nurse Foster was not qualified to opine on
causation, her report was filed within the 120-day deadline and addressed all three
statutory elements. See In re Buster, 275 S.W.3d 475, 476-77 (Tex. 2008) (per curiam)
(holding that "[a] report by an unqualified expert will sometimes (though not always)" be
enough "to justify a 30-day extension"); Nexion Health at Oak Manor, Inc. v. Brewer, 243
S.W.3d 848, 851 (Tex. App.-Tyler 2008), rev'd on other grounds, In re Buster, 275 S.W.3d
at 477; see also Rusk State Hospital v. Black, No. 12-09-00206-CV, 2010 WL 2543470,
at *8 (Tex. App.-Tyler June 23, 2010, no pet. h.) (mem. op.) (holding that a thirty-day
extension may be granted where a report, although deficient because the expert
psychologist "was not qualified [under the statute] to offer an opinion on the causation
question," still included analysis of all "three statutory concerns"). Thus, under Ogletree,
we have no jurisdiction over the trial court's granting of the extension, and we do not reach
Spohn's first issue. (3) 

B. Causation

 By Spohn's second issue and Sheridan's first, both argue that the Lackeys' expert
report fails to establish that any negligence by Spohn or Sheridan caused Margaret's
injuries and death. (4) Although it is true that only a physician is qualified under section
74.351 to offer an opinion on causation, see Tex. Civ. Prac. & Rem. Code Ann. §
74.351(r)(5)(C), "nothing in the health care liability statute prohibits an otherwise qualified
physician from relying on a nurse's report in the formation of the physician's own opinion." 
Kelly v. Rendon, 255 S.W.3d 665, 676 (Tex. App.-Houston [14th Dist.] 2008, no pet.). Dr.
Rushing did just that in this case. Moreover, the health care liability statute is clear that a
claimant can satisfy any requirement of the statute by providing reports of separate
experts. See Tex. Civ. Prac. & Rem. Code Ann. § 74.351(i); see also Martin v. Abilene
Reg'l Med. Ctr., No. 11-04-00303-CV, 2006 WL 241509, at *4 (Tex. App.-Eastland Feb.
2, 2006, no pet.) (mem. op.). As a result, we are permitted, as was the trial court, to read
Dr. Rushing and Nurse Foster's reports together in determining whether the Lackeys
established the causal relationship between any negligence by Spohn and Sheridan and
the injuries suffered by Margaret and by the Lackeys. See Kelly, 255 S.W.3d at 676
(holding that because the physician experts incorporated the nurse expert's report into their
own reports and relied on the nurse's report in the formation of their opinions regarding the
standard of care and causation as it applied to hospital, the trial court did not abuse its
discretion in considering the nurse's report in its determination of the hospital's motion to
dismiss for the inadequacy of patient's expert reports); see also Martin, 2006 WL 241509,
at *4 (holding that a trial court, in determining whether a claimant established the requisite
causal relationship, should not review a doctor's expert report in isolation and should,
instead, read a doctor's and a nurse's expert reports together). 

 Dr. Rushing's report includes, in relevant part, the following information:

 I have been asked to determine whether or not the care and treatment
provided by [Spohn] and its nursing staff and [Sheridan] and its staff to
[Margaret] met the applicable standards of care and if the care did fall below
such standards, whether any injuries resulted from the breach of the
standards. . . .


 . . . .


 In this case, I reviewed the following records:


 1. Christus Spohn Hospital Shoreline.

 2. Sheridan on Rock Prairie.

 3. Frances S. Foster, R.N. report.

 . . . .

 [Margaret] was born on 03/03/27. She was admitted to the Spohn Hospital
on 04/15/07. She was found to be paraplegic and unable to use her legs
and this was due to spinal cord infarot. She also had diabetes type II, atrial
fibrillation, dyslipidemia, and was "forgetful" and periodically confused. . . . 


 When she came to the Spohn Hospital she did not have any pressure ulcers
or skin break down. She did complain of back and leg pain. On the initial
nursing assessment, her Braden scale was 15, a score of 15 to 18 indicates
"mild risk" for development of pressure ulcers.

 

 On 04/18/07 in the nurse[']s notes a blister filled with fluid on the coccyx is
documented, pictures were taken as well and pictures of a dark spot on the
right heel. The heels were elevated off the bed. On 04/20/07 in the nurse
[sic] notes there is documented a stage II coccyx ulcer without size and
bilateral purplish discoloration to the heels is described and the record
indicates the heels were elevated with pillows, repositioned for comfort and
that she was confused. On 04/22 the record says an air mattress was
placed. It also said that she was dependent and incontinent. On 04/23 the
record reflects she was encouraged to stay off her back and repositioned
with the note that she tolerates repositioning poorly. Physical therapy began
providing wound care.


 On 04/21 the physical therapy assessment simply lists a stage II ulcer of the
sacrum and the right heel both with deep tissue injury. A physical therapy
note on 04/30/07 states that the patient is found to [be] nearly always lying
on her back on her wound, patient with decreased memory and thus does
not remember to maintain turning schedule. On the daily wound care notes
there is documentation of progressive enlargement of the pressure ulcer and
worsening of the ulcer. This record also reflects "patient educated on
positioning to decrease pressure, this was on visit no. 8 on 04/29/07." Also
noted is patient is forgetting to roll on her sides. 


 There are photographs from 04/21/07 showing the sacral area with a stage
II ulcer with deep tissue injury and a right heel photograph that shows an
unopened bruise with deep tissue injury. On 04/28/07 there is a photograph
of the sacrum that describes a 12.8 x 9.5 x depth undetermined sacral ulcer. 
Clearly there was a progressive worsening of this woman's pressure ulcers
while she was a resident at the Spohn Hospital.


 . . . . 


 Specifically in this case, the standard of care requires that Spohn Hospital
and its nursing staff provide the necessary care and treatment to prevent the
development of pressure ulcers. The standard of care requires that there be
a regular documented scheduled turning and repositioning program for the
patient. The patient should be turned every two hours and each and every
turn documented and the position in which the patient was placed should be
documented. There is no regularly scheduled documented and
respositioning [sic] schedule in this record. There are occasional/periodic
notations that the patient was turned and repositioned. There are multiple
entries stating that the patient was encouraged to stay off [her] back. There
are also notations saying that the patient is almost always found on her back. 
There are also notations stating that the patient was educated on position to
decrease pressure on her back and that she forgets to roll on her sides. To
expect a patient who is confused to remember to roll on her sides or to
reposition herself is simply unrealistic and below the standards of care
because this woman was a paraplegic, unable to use her legs and could not
reposition herself. As far as her almost always being found on her back
there should have been appropriate wedges, pillows, and devices to maintain
her in a position on either side that relieves the pressure on the sacral area. 
To try and educate a patient who is confused and "forgetful" to stay off the
back to relieve pressure is simply unrealistic and below the standards of
care. The standard of care requires that the nurses provide this service and
it was not done.


 The care and treatment provided to [Margaret] by [Spohn] and its staff fell
below the accepted standards of care in the following ways:


 1. Failed to provide adequate pressure ulcer prevention and
treatment.

 2. Failed to prevent the development of a pressure ulcer.

 3. Failed to keep appropriate clinical records.


 . . . .


 As a result of these failures, [Margaret] developed a pressure ulcer that
required prolonged, intensive care and treatment. As a result, she was
subjected to substantial pain and suffering and extended hospitalization.


 It is my opinion that the failures outlined here proximately caused
[Margaret]'s pressure ulcers. Had it not been for these failures, Mrs. Lackey
would not have developed the sacral pressure ulcer that she did.


 Dr. Rushing then states that Margaret was transferred to the Sheridan nursing home
on May 1, 2007, and describes the development and worsening of Margaret's condition at
the nursing home. He states that Sheridan should not have accepted a resident they could
not adequately care for and that Sheridan failed to give Margaret the proper medical care
and dietary management to improve her condition and prevent its worsening. He
concludes that: 

 It is my opinion that the failures outlined here proximately caused [Margaret]
to develop pressure ulcer on her left heel and proximately caused the
worsening of her sacral ulcer. It is also my opinion that the failures outlined
here proximately caused [Margaret]'s death. Had it not been for these
failures, [Margaret] would not have died when she did.


 We have also reviewed Nurse Foster's report, which provides the following, in
relevant part:

 Functionally, according to the April 16th Consultation [at Spohn], prior to her
Spohn Hospital admission, [Margaret] was up and about, active and
attentive, when she celebrated her 80th birthday on about March 3, 2007.

 

 However, recently [Margaret] developed pain in her back, buttocks, legs, and
had difficulty walking. Since then she has become dependent in her mobility,
including bed mobility due to pain with movement, and has become
essentially bed and chair bound. Additionally, [Margaret] was noted to have
been forgetful.


 On [April] 15th, [Margaret's admission records at Spohn] noted that [she] had
no pressure ulcers, and was not at risk for development of pressure ulcers
. . . . However, a second [admission record] completed the same day . . .
noted that [Margaret]'s pressure sore risk was "mild". Therefore, Spohn
nurses knew in advance, or should have known, that [Margaret] required skin
breakdown precautions for pressure ulcer prevention.


 Nurse Foster then describes the progressing development, from April 19 to April 21,
of pressure ulcers in Margaret's sacro-coccygeal area and on her right heel and notes that
physical therapy (PT) for wound management was initiated. Nurse Foster continues as
follows:

 Pressure relief is essential for both the prevention and treatment of pressure
ulcers, since they are essentially formed by "pressure". Since [Margaret]
was a dependent patient, she required assistance, from the nursing staff,
with proper repositioning every 2 hours, to relieve pressure.

 

 . . . .

 

 On April 29th, [the PT technician] noted that [Margaret]'s pressure ulcers
were "getting bigger"[;] that she was "forgetting to roll on her side to relieve
pressure"[;] and that she had a maximal amount of green, sweet-smelling,
sacral wound drainage, indicating a "Pseudomonas infection".

 

 . . . . 

 

 The plan of care upon admission, was for PT to treat [Margaret]'s pressure
ulcer for 4 days, and then discharge to nursing, "if sacrum proceeding well
and improved". However, pressure relief, adequate repositioning, and
improvement did not occur. Therefore, PT treated [Margaret]'s pressure
ulcers until discharge.

 

 . . . . 

 

 Photographs of [Margaret]'s [s]acral and right heel pressure ulcers, taken
from April 19th through the 28th, verified that her pressure ulcers were
advancing to potentially life-threatening stages . . . .

 


 While the nurses ordinarily provided pain management upon request by
[Margaret], pre-medication for pain prior to wound care and dressing
changes by PT, which would have been painful for [Margaret], was not
planned nor routinely provided by the Spohn Hospital nurses.

 

 On May 1, 2007, [Margaret] was transferred by Spohn Hospital to Sheridan
Nursing Home, for wound care of her stage IV sacral pressure ulcer, and for
continuing care. Ms. Lackey was noted to be forgetful, and required
assistance with eating, for nutrition and hydration, as well as with her
mobility.


 . . . . 

 

 Once again, Sheridan nurses knew, or should have known, that [Margaret]
was at risk for impaired healing of her pressure ulcers, if pressure relief by
proper repositioning was not provided at least every 2 hours, and two weeks
of Nurse's Notes revealed that [Margaret] was repositioned only six times.

 

 . . . . 

 

 According to the Nursing Notes from May 2nd through May 24th, [Margaret]
was turned and repositioned only 6 times, and was noted to be "for comfort"[]
when additionally, the purpose of proper repositioning was to prevent excess
pressure from coming to bear on the bony prominences of her sacrum and
right heel.

 

 The Sheridan nurses ordinarily provided pain management as requested by
[Margaret] . . . . However, pre-medication for pain, prior to wound care and
dressing changes by PT, which would most likely have been painful for
[Margaret], was not planned or routinely provided by the Sheridan Nursing
Home nurses.




 Finally, Nurse Foster notes in her report that Margaret had a kidney infection when
she was admitted at Spohn; was taken to the emergency room for a urinary tract infection
while she was at the Sheridan nursing home; and had "dark or bloody" urine on occasion
while at Sheridan. She concludes that: 

 The nursing care rendered to [Margaret] . . . breached the applicable
standards of nursing practice, evidenced sub-standard nursing care,
constituted nursing negligence . . . and foreseeably and proximately resulted
in injury and/or harm as follows:


 1. Impaired healing stage IV sacral pressure ulcer, in the absence of
frequent repositioning for pressure relief;


 2. Unnecessary pain, suffering, and mental anguish, in the absence of
scheduled pre-medication for pain, prior to painful wound care and
pressure ulcer dressing changes;


 3. Further impaired functional status;


 4. Further impaired quality of life; and


 5. Nursing staffs foreseeably and proximately, more likely than not, at
least contributed to, and/or hastened [Margaret]'s death.


1. Survival


 Spohn first challenges Dr. Rushing's causation opinion on the Lackeys' survival
claim. Spohn argues that Dr. Rushing's report is conclusory because he fails to provide
a medical description of events linking Spohn's alleged negligence to Margaret's pressure
ulcer and fails to explain how Margaret was subject to pain, suffering, and extended
hospitalization because of the ulcer. Having reviewed Nurse Foster and Dr. Rushing's
reports together, we disagree. 

 Dr. Rushing provides detailed descriptions of Spohn's failure to properly monitor and
manage Margaret's medical condition. He describes the progressive worsening of
Margaret's ulcers. He explains that Spohn should have been repositioning Margaret every
two hours and, because staff kept finding Margaret lying on her back, should have been
using "appropriate wedges, pillows, and devices to maintain her in a position on either side
that relieves the pressure on the sacral area." Dr. Rushing states that Spohn's plan to
"educate" a confused and forgetful elderly woman to "stay off her back" was "unrealistic
and below the standards of care." He then deducts that these failures led to the
development of Margaret's pressure ulcers and resulting pain and suffering.

 Nurse Foster's report provides further factual bases for Dr. Rushing's conclusions. 
She notes that, although Margaret had no ulcers when she was admitted, she was at risk
for developing pressure ulcers, and Spohn failed to manage Margaret's condition to
prevent and/or treat for ulcers. She notes that Margaret developed an infection in her
sacral ulcer and that Spohn nurses did not administer proper "pain management" to
decrease Margaret's pain during "wound care and dressing changes." She then concludes
that the negligence of Spohn's nursing staff "impaired healing" of Margaret's ulcers and
caused "unnecessary pain, suffering, and mental anguish" and "impaired functional status
. . . [and] quality of life."

 In sum, when read together, Nurse Foster and Dr. Rushing's reports provide an
adequate factual basis linking the alleged negligence of Spohn to Margaret's pain and
suffering during her life as a result of her pressure ulcers. See Bowie Mem'l Hosp., 79
S.W.3d at 52-53. As to the Lackeys' survival claim, the two reports put Spohn on notice
of the complained-of conduct and gave the trial court a basis on which to conclude the
Lackeys' survival claim had merit. See Palacios, 46 S.W.3d at 879. The trial court
therefore did not abuse its discretion in denying Spohn's motions to dismiss as to the
Lackey's survival claim. (5)

2. Wrongful Death

 Both Spohn and Sheridan challenge Dr. Rushing's causation opinion on the
Lackeys' wrongful death claim. Spohn argues that Dr. Rushing's report is conclusory as
to that claim because it does not link Spohn's alleged negligence to Margaret's death. 
Spohn also argues that Dr. Rushing's conclusions as to the wrongful death claim are
speculative and based on conjecture because he did not review the records from the
hospital to which Margaret was transferred immediately before her death. Sheridan
similarly argues that the proximate cause portion of Dr. Rushing's report is conclusory. We
agree that the reports are deficient as to the Lackeys' wrongful death claim.

 Margaret died at St. Joseph's Hospital on June 1, 2007, one month after she was
discharged from Spohn's care and five days after she was discharged from the Sheridan
nursing home. While Dr. Rushing and Nurse Foster's reports include detailed information
regarding the contribution of Spohn and Sheridan's alleged negligence to the development
and worsening of Margaret's ulcers and the suffering she experienced during her life as a
result, the reports provide simply no analysis or explanation linking the acts and omissions
of Spohn and Sheridan during their care of Margaret to her death. The only mention of
Margaret's death in both reports are conclusory statements of proximate cause. Dr.
Rushing's report includes the following: "It is also my opinion that the failures outlined here
proximately caused [Margaret]'s death. Had it not been for these failures, [Margaret] would
not have died when she did." Nurse Foster similarly states that: "Nursing staffs [of Spohn
and Sheridan] foreseeably and proximately, more likely than not, at least contributed to,
and/or hastened [Margaret]'s death." 

 While it is true that multiple experts may address causation issues and that we may
consider a nurse's report in our causation review if the doctor incorporated that report into
his own, see Tex. Civ. Prac. & Rem. Code Ann. § 75.351(i), Kelly, 255 S.W.3d at 676,
here, Nurse Foster's report does not fill in the gaps left by Dr. Rushing's. See Austin Heart,
P.A., 228 S.W.3d at 279. As previously discussed, we find no explanation in either report
of how Margaret's ulcers caused her death. Rather, we are left to speculate about the
potential causes of Margaret's death--infection in the ulcer, other complications from the
ulcer, kidney infection, urinary tract infection--that are merely mentioned in passing in
Nurse Foster's report. In fact, Dr. Rushing makes no mention of any of these
potentialities. (6) And we are not permitted to draw any inferences in that regard. See
Castillo, 248 S.W.3d at 883.

 Looking only to the four corners of their reports, we cannot conclude that the
Lackeys adequately addressed causation for their wrongful death claim. See Palacios, 46
S.W.3d at 878. The statements in the reports related to causation are conclusory and do
not provide a factual basis linking Spohn and Sheridan's alleged breaches to Margaret's
death. See Bowie Mem'l Hosp., 79 S.W.3d at 52-53. Because the Lackeys' expert reports
are missing one of the required elements as to this claim, they are not good faith efforts
to comply with the statute, and the trial court abused its discretion in denying Spohn and
Sheridan's motions to dismiss insofar as they complain of the Lackeys' wrongful death
claim. See Tex. Civ. Prac. & Rem. Code Ann. § 74.351(l); Palacios, 46 S.W.3d at 878-79. 
3. Disposition

 We overrule Spohn's second issue and Sheridan's first as to the Lackeys' survival
claim because Dr. Rushing's report sufficiently establishes causation for the pain and
suffering of Margaret during her life. We sustain Spohn's second issue and Sheridan's first
as to the Lackeys' wrongful death claim because Dr. Rushing's report fails to establish a
causal link between Spohn and Sheridan's alleged negligence and Margaret's death.

 Having concluded that the trial court erred in denying Spohn and Sheridan's motions
to dismiss the Lackeys' wrongful death claim, we also conclude that Spohn and Sheridan
were entitled to reasonable attorneys' fees and costs pursuant to section 74.351 for that
claim. See Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b).

IV. Conclusion

 Accordingly, we affirm the trial court's denial of Spohn and Sheridan's motions to
dismiss the Lackey's survival claim. However, we reverse the trial court's denial of Spohn
and Sheridan's motions to dismiss the Lackeys' wrongful death claim and remand with
instructions to enter an order, under chapter 74, dismissing the Lackeys' wrongful death
claim with prejudice and for entry of reasonable attorneys' fees and costs related to that
claim. See id. 

 NELDA V. RODRIGUEZ

 Justice


Delivered and filed the 

19th day of August, 2010.

1. Ronny Lee Lackey filed suit in his individual capacity, as independent executor of the estate of
Margaret Baker Lackey, and on behalf of all persons entitled to recover for the death of Margaret. David
Lackey filed suit in his individual capacity as the wrongful death beneficiary of Margaret.
2. Sheridan incorporates by reference this argument by Spohn. See Tex. R. App. P. 9.7. However, for
ease of reference in our analysis, we refer to the proceeding as Spohn's argument.
3. To the extent that Sheridan has incorporated this issue by reference, we also lack jurisdiction over
it as it applies to Sheridan. See id.
4. Neither Spohn nor Sheridan challenge the standard of care and breach elements of the Lackeys'
reports or Dr. Rushing's particular qualifications to opine on causation under the facts of this case.
5. We note that, in its brief, Sheridan does not challenge the causation element of Dr. Rushing's report
as to the Lackeys' survival claim against Sheridan. Sheridan's argument against causation references only
the wrongful death claim.
6. Moreover, the Lackeys make no claim that Margaret's death was caused by any other condition; their
petition alleges only that Spohn and Sheridan's alleged failure to treat Margaret's pressure ulcers led to her
death.