

# NUMBER 13-10-00222-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

CHRISTUS SPOHN HEALTH SYSTEM
CORPORATION D/B/A CHRISTUS
SPOHN HOSPITAL CORPUS CHRISTI-
SHORELINE AND SULIK SHERIDAN
ROCK PRAIRIE, INC., D/B/A SHERIDAN
OF ROCK PRAIRIE,                                          Appellants,

v.

RONNY LEE LACKEY, INDIVIDUALLY AND
AS INDEPENDENT EXECUTOR OF THE
ESTATE MARGARET BAKER LACKEY,
DECEASED, AND ON BEHALF OF ALL
PERSONS ENTITLED TO RECOVER FOR
THE DEATH OF MARGARET BAKER LACKEY,
DECEASED; AND DAVID LACKEY, INDIVIDUALLY,
AS WRONGFUL DEATH BENEFICIARY OF
MARGARET BAKER LACKEY, DECEASED,                         Appellees.

## On appeal from the 28th District Court
## of Nueces County, Texas.

# MEMORANDUM OPINION

## Before Justices Rodriguez, Benavides, and Vela
## Memorandum Opinion by Justice Rodriguez

In this accelerated appeal, appellants Christus Spohn Health System Corporation d/b/a Christus Spohn Hospital Corpus Christi–Shoreline (Spohn) and Sulik Sheridan Rock Prairie, Inc. d/b/a Sheridan of Rock Prairie (Sheridan) challenge the trial court's denial of their motions to dismiss appellees Ronny Lee Lackey and David Lackey's[1] (the Lackeys) health care liability claim for failure to file an adequate expert report as required by section 74.351. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a)-(b) (Vernon Supp. 2009). By two issues, Christus Spohn argues that the trial court erred in denying its motion to dismiss because: (1) the Lackeys' only timely expert report was authored by a nurse who was statutorily unqualified to opine on causation, and (2) alternatively, the Lackeys' report authored by a physician did not establish causation. By one issue, Sheridan also challenges the causation element of the Lackeys' expert report. We affirm, in part, and reverse and remand, in part.

## I. BACKGROUND

The Lackeys brought both survival and wrongful death causes of action against Spohn and Sheridan for alleged negligence in connection with their treatment of eighty-year-old Margaret Baker Lackey. While Margaret was a patient at Spohn for approximately two weeks in April 2007, she developed pressure ulcers. On May 1, 2007, Margaret was

---

[1]Ronny Lee Lackey filed suit in his individual capacity, as independent executor of the estate of Margaret Baker Lackey, and on behalf of all persons entitled to recover for the death of Margaret. David Lackey filed suit in his individual capacity as the wrongful death beneficiary of Margaret.

transferred to a nursing home operated by Sheridan, at which the Lackeys allege Margaret's ulcers continued to worsen. Margaret was transferred to St. Joseph's Hospital on May 25, 2007, where she eventually died on June 1, 2007. The Lackeys allege that Spohn and Sheridan's failure to properly treat Margaret's pressure ulcers led to her death.

Specifically, the Lackeys allege that Spohn and its employees failed to "institute timely and appropriate treatment to stabilize or correct [Margaret]'s medical condition" and failed to "ensure the staff adequately assessed, monitored and treated [Margaret] during her hospitalization." The Lackeys allege that Sheridan and its employees failed to: "exercise the ordinary care and diligence of health care providers in their specialty"; "thoroughly perform continued physical assessments" and "prevent [Margaret] from sustaining pressure sores"; "adequately assess" and "accurately report and document [Margaret]'s symptoms, responses and status"; "provide necessary services in a timely manner which placed [Margaret] at high risk for compromised care"; and "provide appropriate intervention for [Margaret] who had exhibited a significant change in medical condition." The Lackeys allege that, as a result of Spohn and Sheridan's negligence, Margaret suffered pain and mental anguish during her life (the survival action). The Lackeys also allege that the "untimely death" of Margaret caused them physical pain and mental anguish (the wrongful death action). They seek "all pecuniary loss, loss of inheritance, funeral and burial expenses, loss of care and maintenance, love, comfort, support, advice, counsel, past and future emotional pain, mental anguish, torment, and suffering due to the agonizing death of [Margaret]."

Both Spohn and Sheridan answered the Lackeys' petition. The Lackeys then served on Spohn and Sheridan an expert report authored by Frances Scholl Foster,

3

M.S.N., R.N. within 120 days of the filing of their lawsuit. Both Spohn and Sheridan filed objections to the report and motions to dismiss, contesting the adequacy of Nurse Foster's report under section 74.351. *See id.* § 74.351(r)(6). The trial court found Nurse Foster's report deficient and sustained Spohn and Sheridan's objections but determined the report was a good-faith effort, denied Spohn and Sheridan's motions to dismiss, and granted the Lackeys a thirty-day extension to cure the deficiency. *See id.* § 74.351(c). Thereafter, the Lackeys served the expert report of Lige B. Rushing, Jr., M.D. Spohn and Sheridan filed another round of objections to Dr. Rushing's report and second motions to dismiss, arguing that Dr. Rushing's report failed to adequately address causation. The trial court denied Spohn and Sheridan's second motions to dismiss, and this appeal followed. *See id.* § 51.014(a)(9) (Vernon 2008) (authorizing an interlocutory appeal of the denial of a motion to dismiss filed under section 74.351(b)).

## II. Standard of Review and Applicable Law

We review a trial court's decision on a motion to dismiss under section 74.351 of the civil practice and remedies code for abuse of discretion. *Jernigan v. Langley*, 195 S.W.3d 91, 93 (Tex. 2006); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001). The trial court abuses its discretion if it acts unreasonably or arbitrarily or without reference to any guiding rules or principles. *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003).

Under section 74.351, a claimant must "serve on each party or the party's attorney" an expert report and curriculum vitae "not later than the 120th day after the date the original petition was filed." TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a). An expert

4

report is "a written report by an expert that provides a fair summary of the expert's opinions . . . regarding applicable standards of care, the manner in which the care rendered . . . failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351(r)(6).

A "fair summary" of the applicable standard of care and breach identifies the type of care expected but not rendered. *Palacios*, 46 S.W.3d at 880. The causation requirement is met if the report explains the basis of the expert's statement, linking his conclusions to the facts. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). A conclusory report does not meet the statutory test because it does not satisfy *Palacios*. *Id.* at 53. Causation may not be inferred. *Castillo v. August*, 248 S.W.3d 874, 883 (Tex. App.–El Paso 2008, no pet.).

In our review of the expert report, we are limited to the four corners of the report in determining whether the report manifests a good faith effort to comply with the statutory definition of an expert report. *Palacios*, 46 S.W.3d at 878; *see* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(*l*) (requiring that the trial court "grant a motion challenging the adequacy of the expert report only if appears to the court, after hearing, that the report does not represent an objective good faith effort to comply" with the statutory definition). A court may not fill in gaps in a report by drawing inferences or guessing what the expert meant or intended. *Austin Heart, P.A. v. Webb*, 228 S.W.3d 276, 279 (Tex. App.–Austin 2007, no pet.). But the report "need not marshal all the plaintiff's proof." *Palacios*, 46 S.W.3d at 878; *Jernigan*, 195 S.W.3d at 93. If the expert report puts the defendant on notice of the specific conduct complained of and provides the trial court a basis on which

to conclude the claims have merit, the report represents a good-faith effort to comply with the statute. *Palacios*, 46 S.W.3d at 879.

## III. DISCUSSION

### A. Jurisdiction

By its first issue, Spohn argues that the trial court erred in denying its motion to dismiss because the Lackeys' only timely expert report was authored by Nurse Foster and was, therefore, no report at all because a nurse is statutorily unqualified to opine on causation.[2] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(5)(C). Spohn points to cases from this Court and others holding that an expert report that omits any of the statutory elements cannot be a good-faith effort. *See Bowie Mem'l Hosp.*, 79 S.W.3d at 52; *Palacios*, 46 S.W.3d at 879; *see also Alford v. Belacazar*, No. 13-07-00657-CV, 2008 WL 3868114, at *2 (Tex. App.–Corpus Christi Aug. 21, 2008, no pet.) (mem. op.). Spohn argues that, by the reasoning of those cases, Nurse Foster's report cannot be a good-faith effort, and the trial court therefore erred in granting the Lackeys a thirty-day extension to cure the deficiencies of the report. However, we decline to reach Spohn's argument because we do not have jurisdiction over the issue.

Whether a claimant is entitled to a thirty-day extension to cure a deficiency in its expert report is a matter committed to the discretion of the trial court. *Ogletree v. Matthews*, 262 S.W.3d 316, 320-21 (Tex. 2007); *see McKeever v. Cerny*, 266 S.W.3d 451, 455 (Tex. App.–Corpus Christi 2008, no pet.). Although section 51.014(a)(9) of the civil practice and remedies code authorizes an interlocutory appeal from the denial of a health

---

[2]Sheridan incorporates by reference this argument by Spohn. *See* TEX. R. APP. P. 9.7. However, for ease of reference in our analysis, we refer to the proceeding as Spohn's argument.

6

care defendant's motion to dismiss based on the deficiency of an expert report, it also provides that "an appeal *may not* be taken from an order granting a [thirty-day] extension . . . ." TEX. CIV. PRAC. & REM. CODE. § 51.014(a)(9) (emphasis added). The Texas Supreme Court has clarified that "if a deficient report is served and the trial court grants a thirty-day extension, that decision—even if coupled with a denial of a motion to dismiss—is not subject to appellate review." *Ogletree*, 262 S.W.3d at 321; *see McKeever*, 266 S.W.3d at 455.

Here, we conclude that the trial court acted within its discretion in finding the Lackeys' report deficient but curable—although Nurse Foster was not qualified to opine on causation, her report was filed within the 120-day deadline and addressed all three statutory elements. *See In re Buster*, 275 S.W.3d 475, 476-77 (Tex. 2008) (per curiam) (holding that "[a] report by an unqualified expert will sometimes (though not always)" be enough "to justify a 30-day extension"); *Nexion Health at Oak Manor, Inc. v. Brewer*, 243 S.W.3d 848, 851 (Tex. App.–Tyler 2008), *rev'd on other grounds*, *In re Buster*, 275 S.W.3d at 477; *see also Rusk State Hospital v. Black*, No. 12-09-00206-CV, 2010 WL 2543470, at *8 (Tex. App.–Tyler June 23, 2010, no pet. h.) (mem. op.) (holding that a thirty-day extension may be granted where a report, although deficient because the expert psychologist "was not qualified [under the statute] to offer an opinion on the causation question," still included analysis of all "three statutory concerns"). Thus, under *Ogletree*, we have no jurisdiction over the trial court's granting of the extension, and we do not reach Spohn's first issue.[3]

---

[3]To the extent that Sheridan has incorporated this issue by reference, we also lack jurisdiction over it as it applies to Sheridan. *See id.*

## B. Causation

By Spohn's second issue and Sheridan's first, both argue that the Lackeys' expert report fails to establish that any negligence by Spohn or Sheridan caused Margaret's injuries and death.[4]  Although it is true that only a physician is qualified under section 74.351 to offer an opinion on causation, *see* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(5)(C), "nothing in the health care liability statute prohibits an otherwise qualified physician from relying on a nurse's report in the formation of the physician's own opinion." *Kelly v. Rendon*, 255 S.W.3d 665, 676 (Tex. App.–Houston [14th Dist.] 2008, no pet.).  Dr. Rushing did just that in this case.  Moreover, the health care liability statute is clear that a claimant can satisfy any requirement of the statute by providing reports of separate experts.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(i); *see also Martin v. Abilene Reg'l Med. Ctr.*, No. 11-04-00303-CV, 2006 WL 241509, at *4 (Tex. App.–Eastland Feb. 2, 2006, no pet.) (mem. op.).  As a result, we are permitted, as was the trial court, to read Dr. Rushing and Nurse Foster's reports together in determining whether the Lackeys established the causal relationship between any negligence by Spohn and Sheridan and the injuries suffered by Margaret and by the Lackeys.  *See Kelly*, 255 S.W.3d at 676 (holding that because the physician experts incorporated the nurse expert's report into their own reports and relied on the nurse's report in the formation of their opinions regarding the standard of care and causation as it applied to hospital, the trial court did not abuse its discretion in considering the nurse's report in its determination of the hospital's motion to dismiss for the inadequacy of patient's expert reports); *see also Martin*, 2006 WL 241509,

---

[4]Neither Spohn nor Sheridan challenge the standard of care and breach elements of the Lackeys' reports or Dr. Rushing's particular qualifications to opine on causation under the facts of this case.

8

at *4 (holding that a trial court, in determining whether a claimant established the requisite causal relationship, should not review a doctor's expert report in isolation and should, instead, read a doctor's and a nurse's expert reports together).

Dr. Rushing's report includes, in relevant part, the following information:

I have been asked to determine whether or not the care and treatment provided by [Spohn] and its nursing staff and [Sheridan] and its staff to [Margaret] met the applicable standards of care and if the care did fall below such standards, whether any injuries resulted from the breach of the standards. . . .

. . . .

In this case, I reviewed the following records:

1. Christus Spohn Hospital Shoreline.
2. Sheridan on Rock Prairie.
3. Frances S. Foster, R.N. report.

. . . .

[Margaret] was born on 03/03/27. She was admitted to the Spohn Hospital on 04/15/07. She was found to be paraplegic and unable to use her legs and this was due to spinal cord infarot. She also had diabetes type II, atrial fibrillation, dyslipidemia, and was "forgetful" and periodically confused. . . .

When she came to the Spohn Hospital she did not have any pressure ulcers or skin break down. She did complain of back and leg pain. On the initial nursing assessment, her Braden scale was 15, a score of 15 to 18 indicates "mild risk" for development of pressure ulcers.

On 04/18/07 in the nurse[']s notes a blister filled with fluid on the coccyx is documented, pictures were taken as well and pictures of a dark spot on the right heel. The heels were elevated off the bed. On 04/20/07 in the nurse [sic] notes there is documented a stage II coccyx ulcer without size and bilateral purplish discoloration to the heels is described and the record indicates the heels were elevated with pillows, repositioned for comfort and that she was confused. On 04/22 the record says an air mattress was placed. It also said that she was dependent and incontinent. On 04/23 the record reflects she was encouraged to stay off her back and repositioned with the note that she tolerates repositioning poorly. Physical therapy began providing wound care.

9

On 04/21 the physical therapy assessment simply lists a stage II ulcer of the sacrum and the right heel both with deep tissue injury. A physical therapy note on 04/30/07 states that the patient is found to [be] nearly always lying on her back on her wound, patient with decreased memory and thus does not remember to maintain turning schedule. On the daily wound care notes there is documentation of progressive enlargement of the pressure ulcer and worsening of the ulcer. This record also reflects "patient educated on positioning to decrease pressure, this was on visit no. 8 on 04/29/07." Also noted is patient is forgetting to roll on her sides.

There are photographs from 04/21/07 showing the sacral area with a stage II ulcer with deep tissue injury and a right heel photograph that shows an unopened bruise with deep tissue injury. On 04/28/07 there is a photograph of the sacrum that describes a 12.8 x 9.5 x depth undetermined sacral ulcer. Clearly there was a progressive worsening of this woman's pressure ulcers while she was a resident at the Spohn Hospital.

. . . .

Specifically in this case, the standard of care requires that Spohn Hospital and its nursing staff provide the necessary care and treatment to prevent the development of pressure ulcers. The standard of care requires that there be a regular documented scheduled turning and repositioning program for the patient. The patient should be turned every two hours and each and every turn documented and the position in which the patient was placed should be documented. There is no regularly scheduled documented and respositioning [sic] schedule in this record. There are occasional/periodic notations that the patient was turned and repositioned. There are multiple entries stating that the patient was encouraged to stay off [her] back. There are also notations saying that the patient is almost always found on her back. There are also notations stating that the patient was educated on position to decrease pressure on her back and that she forgets to roll on her sides. To expect a patient who is confused to remember to roll on her sides or to reposition herself is simply unrealistic and below the standards of care because this woman was a paraplegic, unable to use her legs and could not reposition herself. As far as her almost always being found on her back there should have been appropriate wedges, pillows, and devices to maintain her in a position on either side that relieves the pressure on the sacral area. To try and educate a patient who is confused and "forgetful" to stay off the back to relieve pressure is simply unrealistic and below the standards of care. The standard of care requires that the nurses provide this service and it was not done.

The care and treatment provided to [Margaret] by [Spohn] and its staff fell below the accepted standards of care in the following ways:

1. Failed to provide adequate pressure ulcer prevention and treatment.
2. Failed to prevent the development of a pressure ulcer.
3. Failed to keep appropriate clinical records.

. . . .

> As a result of these failures, [Margaret] developed a pressure ulcer that required prolonged, intensive care and treatment. As a result, she was subjected to substantial pain and suffering and extended hospitalization.

> It is my opinion that the failures outlined here proximately caused [Margaret]'s pressure ulcers. Had it not been for these failures, Mrs. Lackey would not have developed the sacral pressure ulcer that she did.

Dr. Rushing then states that Margaret was transferred to the Sheridan nursing home on May 1, 2007, and describes the development and worsening of Margaret's condition at the nursing home. He states that Sheridan should not have accepted a resident they could not adequately care for and that Sheridan failed to give Margaret the proper medical care and dietary management to improve her condition and prevent its worsening. He concludes that:

> It is my opinion that the failures outlined here proximately caused [Margaret] to develop pressure ulcer on her left heel and proximately caused the worsening of her sacral ulcer. It is also my opinion that the failures outlined here proximately caused [Margaret]'s death. Had it not been for these failures, [Margaret] would not have died when she did.

We have also reviewed Nurse Foster's report, which provides the following, in relevant part:

> Functionally, according to the April 16th Consultation [at Spohn], prior to her Spohn Hospital admission, [Margaret] was up and about, active and attentive, when she celebrated her 80th birthday on about March 3, 2007.

> However, recently [Margaret] developed pain in her back, buttocks, legs, and had difficulty walking. Since then she has become dependent in her mobility, including bed mobility due to pain with movement, and has become

11

essentially bed and chair bound. Additionally, [Margaret] was noted to have been forgetful.

On [April] 15th, [Margaret's admission records at Spohn] noted that [she] had no pressure ulcers, and was not at risk for development of pressure ulcers . . . . However, a second [admission record] completed the same day . . . noted that [Margaret]'s pressure sore risk was "mild". Therefore, Spohn nurses knew in advance, or should have known, that [Margaret] required skin breakdown precautions for pressure ulcer prevention.

Nurse Foster then describes the progressing development, from April 19 to April 21, of pressure ulcers in Margaret's sacro-coccygeal area and on her right heel and notes that physical therapy (PT) for wound management was initiated. Nurse Foster continues as follows:

> Pressure relief is essential for both the prevention and treatment of pressure ulcers, since they are essentially formed by "pressure". Since [Margaret] was a dependent patient, she required assistance, from the nursing staff, with proper repositioning every 2 hours, to relieve pressure.
>
>  . . . .
>
> On April 29th, [the PT technician] noted that [Margaret]'s pressure ulcers were "getting bigger"[;] that she was "forgetting to roll on her side to relieve pressure"[;] and that she had a maximal amount of green, sweet-smelling, sacral wound drainage, indicating a "Pseudomonas infection".
>
> . . . .
>
> The plan of care upon admission, was for PT to treat [Margaret]'s pressure ulcer for 4 days, and then discharge to nursing, "if sacrum proceeding well and improved". However, pressure relief, adequate repositioning, and improvement did not occur. Therefore, PT treated [Margaret]'s pressure ulcers until discharge.
>
> . . . .
>
> Photographs of [Margaret]'s [s]acral and right heel pressure ulcers, taken from April 19th through the 28th, verified that her pressure ulcers were advancing to potentially life-threatening stages . . . .

12

While the nurses ordinarily provided pain management upon request by [Margaret], pre-medication for pain prior to wound care and dressing changes by PT, which would have been painful for [Margaret], was not planned nor routinely provided by the Spohn Hospital nurses.

On May 1, 2007, [Margaret] was transferred by Spohn Hospital to Sheridan Nursing Home, for wound care of her stage IV sacral pressure ulcer, and for continuing care. Ms. Lackey was noted to be forgetful, and required assistance with eating, for nutrition and hydration, as well as with her mobility.

. . . .

Once again, Sheridan nurses knew, or should have known, that [Margaret] was at risk for impaired healing of her pressure ulcers, if pressure relief by proper repositioning was not provided at least every 2 hours, and two weeks of Nurse's Notes revealed that [Margaret] was repositioned only six times.

. . . .

According to the Nursing Notes from May 2nd through May 24th, [Margaret] was turned and repositioned only 6 times, and was noted to be "for comfort"[] when additionally, the purpose of proper repositioning was to prevent excess pressure from coming to bear on the bony prominences of her sacrum and right heel.

The Sheridan nurses ordinarily provided pain management as requested by [Margaret] . . . . However, pre-medication for pain, prior to wound care and dressing changes by PT, which would most likely have been painful for [Margaret], was not planned or routinely provided by the Sheridan Nursing Home nurses.

Finally, Nurse Foster notes in her report that Margaret had a kidney infection when she was admitted at Spohn; was taken to the emergency room for a urinary tract infection while she was at the Sheridan nursing home; and had "dark or bloody" urine on occasion while at Sheridan. She concludes that:

The nursing care rendered to [Margaret] . . . breached the applicable standards of nursing practice, evidenced sub-standard nursing care, constituted nursing negligence . . . and foreseeably and proximately resulted in injury and/or harm as follows:

13

1.  Impaired healing stage IV sacral pressure ulcer, in the absence of frequent repositioning for pressure relief;

2.  Unnecessary pain, suffering, and mental anguish, in the absence of scheduled pre-medication for pain, prior to painful wound care and pressure ulcer dressing changes;

3.  Further impaired functional status;

4.  Further impaired quality of life; and

5.  Nursing staffs foreseeably and proximately, more likely than not, at least contributed to, and/or hastened [Margaret]'s death.

## 1. Survival

Spohn first challenges Dr. Rushing's causation opinion on the Lackeys' survival claim. Spohn argues that Dr. Rushing's report is conclusory because he fails to provide a medical description of events linking Spohn's alleged negligence to Margaret's pressure ulcer and fails to explain how Margaret was subject to pain, suffering, and extended hospitalization because of the ulcer. Having reviewed Nurse Foster and Dr. Rushing's reports together, we disagree.

Dr. Rushing provides detailed descriptions of Spohn's failure to properly monitor and manage Margaret's medical condition. He describes the progressive worsening of Margaret's ulcers. He explains that Spohn should have been repositioning Margaret every two hours and, because staff kept finding Margaret lying on her back, should have been using "appropriate wedges, pillows, and devices to maintain her in a position on either side that relieves the pressure on the sacral area." Dr. Rushing states that Spohn's plan to "educate" a confused and forgetful elderly woman to "stay off her back" was "unrealistic and below the standards of care." He then deducts that these failures led to the development of Margaret's pressure ulcers and resulting pain and suffering.

14

Nurse Foster's report provides further factual bases for Dr. Rushing's conclusions. She notes that, although Margaret had no ulcers when she was admitted, she was at risk for developing pressure ulcers, and Spohn failed to manage Margaret's condition to prevent and/or treat for ulcers. She notes that Margaret developed an infection in her sacral ulcer and that Spohn nurses did not administer proper "pain management" to decrease Margaret's pain during "wound care and dressing changes." She then concludes that the negligence of Spohn's nursing staff "impaired healing" of Margaret's ulcers and caused "unnecessary pain, suffering, and mental anguish" and "impaired functional status . . . [and] quality of life."

In sum, when read together, Nurse Foster and Dr. Rushing's reports provide an adequate factual basis linking the alleged negligence of Spohn to Margaret's pain and suffering during her life as a result of her pressure ulcers. *See Bowie Mem'l Hosp.*, 79 S.W.3d at 52-53. As to the Lackeys' survival claim, the two reports put Spohn on notice of the complained-of conduct and gave the trial court a basis on which to conclude the Lackeys' survival claim had merit. *See Palacios*, 46 S.W.3d at 879. The trial court therefore did not abuse its discretion in denying Spohn's motions to dismiss as to the Lackey's survival claim.[5]

## 2. Wrongful Death

Both Spohn and Sheridan challenge Dr. Rushing's causation opinion on the Lackeys' wrongful death claim. Spohn argues that Dr. Rushing's report is conclusory as to that claim because it does not link Spohn's alleged negligence to Margaret's death.

---

[5]We note that, in its brief, Sheridan does not challenge the causation element of Dr. Rushing's report as to the Lackeys' survival claim against Sheridan. Sheridan's argument against causation references only the wrongful death claim.

15

Spohn also argues that Dr. Rushing's conclusions as to the wrongful death claim are speculative and based on conjecture because he did not review the records from the hospital to which Margaret was transferred immediately before her death. Sheridan similarly argues that the proximate cause portion of Dr. Rushing's report is conclusory. We agree that the reports are deficient as to the Lackeys' wrongful death claim.

Margaret died at St. Joseph's Hospital on June 1, 2007, one month after she was discharged from Spohn's care and five days after she was discharged from the Sheridan nursing home. While Dr. Rushing and Nurse Foster's reports include detailed information regarding the contribution of Spohn and Sheridan's alleged negligence to the development and worsening of Margaret's ulcers and the suffering she experienced during her life as a result, the reports provide simply no analysis or explanation linking the acts and omissions of Spohn and Sheridan during their care of Margaret to her death. The only mention of Margaret's death in both reports are conclusory statements of proximate cause. Dr. Rushing's report includes the following: "It is also my opinion that the failures outlined here proximately caused [Margaret]'s death. Had it not been for these failures, [Margaret] would not have died when she did." Nurse Foster similarly states that: "Nursing staffs [of Spohn and Sheridan] foreseeably and proximately, more likely than not, at least contributed to, and/or hastened [Margaret]'s death."

While it is true that multiple experts may address causation issues and that we may consider a nurse's report in our causation review if the doctor incorporated that report into his own, *see* TEX. CIV. PRAC. & REM. CODE ANN. § 75.351(i), *Kelly*, 255 S.W.3d at 676, here, Nurse Foster's report does not fill in the gaps left by Dr. Rushing's. *See Austin Heart, P.A.*, 228 S.W.3d at 279. As previously discussed, we find no explanation in either report

16

of how Margaret's ulcers caused her death. Rather, we are left to speculate about the potential causes of Margaret's death—infection in the ulcer, other complications from the ulcer, kidney infection, urinary tract infection—that are merely mentioned in passing in Nurse Foster's report. In fact, Dr. Rushing makes no mention of any of these potentialities.[6] And we are not permitted to draw any inferences in that regard. *See Castillo*, 248 S.W.3d at 883.

Looking only to the four corners of their reports, we cannot conclude that the Lackeys adequately addressed causation for their wrongful death claim. *See Palacios*, 46 S.W.3d at 878. The statements in the reports related to causation are conclusory and do not provide a factual basis linking Spohn and Sheridan's alleged breaches to Margaret's death. *See Bowie Mem'l Hosp.*, 79 S.W.3d at 52-53. Because the Lackeys' expert reports are missing one of the required elements as to this claim, they are not good faith efforts to comply with the statute, and the trial court abused its discretion in denying Spohn and Sheridan's motions to dismiss insofar as they complain of the Lackeys' wrongful death claim. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(*l*); *Palacios*, 46 S.W.3d at 878-79.

## 3. Disposition

We overrule Spohn's second issue and Sheridan's first as to the Lackeys' survival claim because Dr. Rushing's report sufficiently establishes causation for the pain and suffering of Margaret during her life. We sustain Spohn's second issue and Sheridan's first as to the Lackeys' wrongful death claim because Dr. Rushing's report fails to establish a causal link between Spohn and Sheridan's alleged negligence and Margaret's death.

---

[6]Moreover, the Lackeys make no claim that Margaret's death was caused by any other condition; their petition alleges only that Spohn and Sheridan's alleged failure to treat Margaret's pressure ulcers led to her death.

17

Having concluded that the trial court erred in denying Spohn and Sheridan's motions to dismiss the Lackeys' wrongful death claim, we also conclude that Spohn and Sheridan were entitled to reasonable attorneys' fees and costs pursuant to section 74.351 for that claim. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b).

## IV. CONCLUSION

Accordingly, we affirm the trial court's denial of Spohn and Sheridan's motions to dismiss the Lackey's survival claim. However, we reverse the trial court's denial of Spohn and Sheridan's motions to dismiss the Lackeys' wrongful death claim and remand with instructions to enter an order, under chapter 74, dismissing the Lackeys' wrongful death claim with prejudice and for entry of reasonable attorneys' fees and costs related to that claim. *See id.*

NELDA V. RODRIGUEZ
Justice

Delivered and filed the
19th day of August, 2010.

18