Opinion issued August 28, 2014



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-13-00572-CV

———————————

**MEMORIAL HERMANN HEALTH SYSTEM, INDIVIDUALLY AND D/B/A MEMORIAL HERMANN HOSPITAL - TEXAS MEDICAL CENTER, MEMORIAL HERMANN HEALTH SYSTEM D/B/A MEMORIAL HERMANN HOSPITAL, Appellants**

**V.**

**DIANNE G. MCBRIDE, Appellee**

---

**On Appeal from the 234th District Court**
**Harris County, Texas**
**Trial Court Case No. 2013-25710**

---

## MEMORANDUM OPINION

In this interlocutory appeal, Memorial Hermann Health System, individually

and d/b/a Memorial Hermann Hospital - Texas Medical Center and Memorial

Hermann Health System d/b/a Memorial Hermann Hospital (collectively "Memorial Hermann") appeal the trial court's order denying their motion challenging the sufficiency of appellee Dianne McBride's expert report of Jon C. Walkes, M.D. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.351, 74.402.[1] We affirm.

## Background

On the morning of January 7, 2012, Dianne McBride was transported by ambulance to the emergency room of Memorial Hermann Hospital, complaining of severe abdominal pain. Following an exploratory procedure, an arterial line was placed in McBride's right superficial femoral artery and she underwent surgery during which a perforated duodenal ulcer was discovered and repaired. McBride was subsequently transferred to the Shock Trauma Intensive Care Unit to recover with her daughters, Connie Stewart and DeMonica Gladney, and her sister, Joyce James, with her at the hospital.

Approximately 8:30 that evening, with Stewart and James at her bedside, McBride, still intubated, awoke briefly several times, hit her right leg, and fell back

---

[1] In 2013, the Legislature amended section 74.351 of the Texas Medical Liability Act. *See* Act of May 26, 2013, 83rd Leg. R.S., ch. 870, § 2. The new provision applies to all suits filed after September 1, 2013. Because McBride filed her original petition prior to September 1, 2013, we will apply the former version of section 74.351 to her claims. *See* Act of May 18, 2005, 79th Leg., R.S., ch. 635, § 1, 2005 TEX. GEN. LAWS 1590 (amended 2013) (current version at TEX. CIV. PRAC. & REM. CODE ANN. § 74.351 (West Supp. 2014)).

2

asleep. When a nurse entered the room between 8:45 and 9:00 p.m., Stewart and James told her that McBride was hitting her leg, complaining as if she were in pain ("8:45 complaint"). The nurse told Stewart and James that she would make a note of it and report it to the doctors. The nurse also advised them to inform the doctors. Stewart and James returned to the waiting room after their visit.

At approximately 9:00 p.m., Stewart and Joyce approached McBride's doctors outside of her room and told them that McBride had woken up, hitting her right leg and trying to mouth something about her leg ("9:00 complaint"). The doctors told them that McBride's stomach was their primary concern and that they would attend to McBride's leg complaint later when she was extubated, and left. When Stewart and James gave McBride a pen and paper so that she could communicate her complaint, McBride wrote that her right leg was "hot" and "numb." Stewart showed McBride's note to one of the nurses at approximately 9:15 p.m., who advised her to report the complaint to the doctors when they returned ("9:15 complaint"). Stewart and James left McBride's room between 9:30 and 10:00 p.m. and remained in the waiting room.

The doctors returned to McBride's room at approximately 6:00 a.m. the next morning. Following an examination during which no pulse was detected in McBride's right leg, an angiogram was performed which revealed that the catheter inserted into her leg for the arterial line had blocked blood flow to the leg resulting

3

in a diagnosis of right lower leg ischemia. Due to the level of irreversible tissue damage caused by the blocked artery, McBride's right leg had to be amputated.[2]

On April 30, 2013, McBride filed suit against Memorial Hermann[3] alleging that appellants' nurses were negligent in their post-surgery treatment by failing to chart and report her right leg complaints to her treating physicians, and attached to her petition an expert report by Jon C. Walkes, M.D. On May 30, 2013, appellants filed a motion challenging the sufficiency of Dr. Walkes's expert report alleging that it failed to demonstrate a causal relationship between any alleged negligence by appellants' nurses and McBride's injury. Following a hearing on June 17, 2013, the trial court denied appellants' motion. It is from the denial of their motion that appellants now appeal.

## Discussion

### A. Chapter 74 Expert Report Requirements

Section 74.351 of the Civil Practice and Remedies Code serves as a "gate-keeper" through which no medical negligence causes of action may proceed until the claimant has made a good-faith effort to demonstrate that at least one expert

---

[2] Dr. Walkes's report notes that one of McBride's treating physicians reportedly told McBride's family that the blockage occurred because "they probably caused it with the arterial line, because the catheter that was used was too large for her arteries."

[3] McBride also named several other defendants, including several of her treating physicians, in her suit but those defendants are not parties to this appeal.

believes that a breach of the applicable standard of care caused the claimed injury. *See* TEX CIV. PRAC. & REM. CODE ANN. § 74.351; *Murphy v. Russell*, 167 S.W.3d 835, 838 (Tex. 2005). To constitute a good faith effort, the report must provide enough information to fulfill two purposes: (1) inform the defendant of the specific conduct that the plaintiff has called into question and (2) provide a basis for the trial court to conclude that the claim has merit. *See Am. Transitional Care Ctrs. of Tex. Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex. 2001). A report that merely states the expert's conclusions as to the standard of care, breach, and causation does not fulfill these two purposes. *Id.* The expert must explain the basis for his statements and link his conclusions to the facts. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (citing *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999)).

Although a report need not marshal all of the plaintiff's proof, it must include the expert's opinions on the three statutory elements: standard of care, breach, and causation. *See Palacios*, 46 S.W.3d at 880 (plaintiff need not present evidence in report as if it were actually litigating merits); *Spitzer v. Berry*, 247 S.W.3d 747, 750 (Tex. App.—Tyler 2008, pet. denied) (quoting *Palacios*, 46 S.W.3d at 880) (stating "fair summary" is "something less than a full statement" of applicable standard of care, how it was breached, and how that breach caused injury). As to causation, an expert report must provide a fair summary of the expert's opinions regarding the causal relationship between the failure of the health

5

care provider to provide care in accord with the pertinent standard of care and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6).

The trial court may not draw any inferences, but must rely exclusively on the information contained within the four corners of the report. *See Palacios*, 46 S.W.3d at 878. We determine whether a causation opinion is sufficient by considering it in the context of the entire report. *Bakhtari v. Estate of Dumas*, 317 S.W.3d 486, 496 (Tex. App.—Dallas 2010, no pet.).

## B. Standard of Review

We review a trial court's ruling on a motion to dismiss for an abuse of discretion. *Palacios,* 46 S.W.3d at 875. A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). In other words, when its actions are arbitrary or unreasonable. *Id.* "The mere fact that a trial judge may decide a matter within his discretionary authority in a different manner than an appellate judge in a similar circumstance does not demonstrate that an abuse of discretion has occurred." *Id.* at 242. However, a trial court has no discretion in determining what the law is or in applying the law to the facts. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992)

6

(orig. proceeding); *Children's Med. Ctr. of Dall. v. Durham,* 402 S.W.3d 391, 395 (Tex. App.—Dallas 2013, no pet.).

## C. Analysis

Memorial Hermann contends that the trial court abused its discretion by denying their motion challenging the sufficiency of Dr. Walkes's expert report because the report does not establish a causal connection between the nurses' alleged negligence and McBride's injury. McBride argues that the trial court did not err in finding that Dr. Walkes's report sufficiently supports a causal link between the nurses' failure to report McBride's complaint and the amputation of her right leg.

In his report, Dr. Walkes discusses the applicable standard of care related to the diagnosis and treatment of ischemia:

> The standard of care for diagnosing ischemia required that the nurses and doctors attending to the patient, who had become aware of the patient's right leg complaint, look for and respond immediately to the clinical symptoms of limb ischemia. The six characteristic signs and symptoms of limb ischemia are:
>
> 1. Pulselessness: An absent or weak pulse in the affected limb is an early warning sign of ischemia;
>
> 2. Pain: The presence and progression of pain to the affected limb is also an early warning sign of ischemia;
>
> 3. Pallor: Paleness of the skin on the affected limb is also an early warning sign and is generally followed by cyanosis, which is a dark bluish or purplish coloration of the skin due to deficient oxygenation of the blood;

7

4. Poikilothermia: Unusual temperature variation, a cold or hot limb is also an early sign of ischemia and the coolness and pallor is usually one level below the point of occlusion on the arterial tree;

5. Paresthesia: The loss of sensation for light touch, two-point discrimination, and vibration is a crucial finding because it may represent the first sign of tissue loss; and

6. Paralysis: Paralysis of the limb is an indication of advanced limb threatening ischemia, usually requiring immediate vascular surgery to avoid amputation.

The standard of care requires that any patient exhibiting any of these symptoms be evaluated for ischemia immediately i.e. without delay. . . . The treatment of limb ischemia is an emergency requiring rapid restoration of blood flow to avoid amputation. If the symptoms are consistent with early onset ischemia, i.e., no detectable pulse in the leg, pain, pallor, and/or the leg is cold or hot[, t]he standard of care requires an arteriogram in order to confirm the ischemia. If the ischemia is confirmed, immediate surgery is indicated to restore blood flow. This should be done without any delay because the level of tissue death that would require amputation can occur in as little as 6 hours following the onset of a complete blockage. . . . In order to have saved this patient's leg, the standard of care required that the physical examination for the six signs of ischemia, arteriogram, and surgery to restore circulation be accomplished within 6 hours following a complete blockage of blood flow. . . . It is reasonably probable that the blockage had been complete by 8:00 [p.]m. when the patient made the initial complaint about right leg pain.

With regard to how the standard of care was breached, Dr. Walkes opined as follows:

The second departure from the standard of care was the failure of the hospital nurse and the doctor on the patient's surgical team . . . to respond appropriately to the patient's post-operative complaints of right leg pain, numbness, and poikilothermia (temperature variant) on the evening of January 7, 2012.

The Memorial Hermann Hospital nurse, to whom the complaint was made on January 7, 2012 following the patient's surgery, was required by the standard of care to chart the complaint and promptly report it to the patient's doctor. This was not done. Had the nurse reported these symptoms to the patient's doctor, the doctor, acting in compliance with the standard of care, would have conducted an immediate assessment, ordered the arteriogram, and initiated the angioplasty or revascularization surgery that was necessary to restore circulation and save the patient's leg before tissue death had progressed too far to save the leg. Had these standards been complied with on the evening of January 7, 2012 as soon as the right leg compliant [sic] was made known, it is my opinion that the patient would not have lost her leg.

In his report, Dr. Walkes also asserts that the physicians to whom Stewart and Joyce reported McBride's complaint at approximately 9:00 p.m. breached the applicable standard of care by failing "to immediately examine or make sure the patient's leg was immediately examined" upon receiving the complaint.

Appellants argue that Dr. Walkes's assertion that McBride's treating physicians were aware of her right leg complaint as of 9:00 p.m. and, therefore, already under a duty to act, is at odds with McBride's claim that the nurse to whom McBride's 9:15 written complaint was shown was negligent in failing to chart and report the complaint to doctors. In other words, appellants contend that Dr.

9

Walkes's opinion regarding the physicians' negligence necessarily broke the chain of causation as to Memorial Hermann, and the nurse's failure to report the 9:15 complaint could not have caused McBride's injury. The hospital cites no authority for this proposition. Dr. Walkes's opinion that both doctors and nurses breached the standard of care and caused McBride's injury are not necessarily inconsistent. *See Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 774 (Tex. 2010) (noting there may be more than one proximate cause of an event).

McBride argues that when Stewart and James informed McBride's doctors at approximately 9:00 p.m. that McBride had awakened hitting her right leg, this information conveyed only a general complaint that something was wrong with her leg. McBride's specific written 9:15 complaint that her right leg was hot and numb however, conveyed at least two characteristic signs of limb ischemia, i.e., poikilothermia (temperature variation) and paresthesia (loss of sensation), symptoms of which the doctors were not aware. According to Dr. Walkes, "[t]he standard of care requires that any patient exhibiting any of these symptoms be evaluated for ischemia immediately, i.e., without delay." Dr. Walkes's report states that the nurse who saw this written complaint had a duty to report these specific symptoms to McBride's doctors so that the patient could be evaluated immediately for ischemia and, in failing to do so, breached the applicable standard of care. Dr. Walkes opined that "[h]ad the nurse reported these symptoms to the

10

patient's doctor, the doctor, acting in compliance with the standard of care, would have conducted an immediate assessment, ordered the arteriogram, and initiated the angioplasty or revascularization surgery that was necessary to restore circulation and save the patient's leg before tissue death had progressed too far to save the leg." Dr. Walkes concluded that "[h]ad these standards been complied with on the evening of January 7, 2012 as soon as the right leg compliant [sic] was made known, it is my opinion that the patient would not have lost her leg."

At this stage of the proceeding, all that is required is that Dr. Walkes's expert report inform the defendants of the specific conduct the plaintiffs have called into question and provide a basis for the trial court to conclude that the claims have merit. *See Palacios,* 46 S.W.3d at 879. Dr. Walkes's report does just that. His report links his causation opinion to specific facts such that appellants had notice of the complaint against them. Keeping in mind that expert reports, such as that of Dr. Walkes, are only a preliminary method to show that a plaintiff has a viable cause of action that is not frivolous or without expert support, we hold the trial court did not abuse its discretion when it denied appellants' motion challenging the sufficiency of Dr. Walkes's expert report on the element of causation. *See Kelly v. Rendon*, 255 S.W.3d 665, 679 (Tex. App.—Houston [14th Dist.] 2008, no pet.). Appellants' issue is overruled.

## Conclusion

We affirm the trial court's order denying appellants' motion challenging the sufficiency of McBride's expert report.

Jim Sharp
Justice

Panel consists of Justices Jennings, Higley, and Sharp.